S.C. JOHNSON & SON, INC., Plaintiff,

v.

CARTER–WALLACE, INC., Defendant.

No. 81 Civ. 1081 (JFK).

United States District Court, S.D. New York.

March 15, 1985.

Robert L. Baechtold, Henry J. Renk, Fitzpatrick, Cella, Harper & Scinto, New York City, Robert M. Newbury, Pattishall, McAuliffe & Hofstetter, Chicago, Ill., for plaintiff.

Jerome G. Lee, John F. Sweeney, Jay M. Brown, Morgan, Finnegan, Pine, Foley & Lee, Paul J. Weiner, Stephen R. Lang, Breed, Abbott & Morgan, New York City, for defendant.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. FINDINGS OF FACT

KEENAN, District Judge:

*The Parties*

Plaintiff S.C. Johnson & Son, Inc. ("Johnson") is a corporation organized and exist-

ing under the laws of the State of Wisconsin. It has its principal place of business in Racine, Wisconsin and is engaged in the business of making and selling consumer products, personal care products and, more importantly so far as this case is concerned, gel shaving products.

Defendant Carter-Wallace, Inc. ("Carter") is a corporation organized and existing under the laws of the State of Delaware. It has its principal place of business in New York, New York and is engaged in the business of making and selling consumer products, personal care products and shaving products.

*Nature of the Case*

This is an action brought by Johnson against Carter for alleged infringement of United States Letters Patent No. 3,541,581 ("the Monson Patent") and for alleged unfair competition and false advertising. The Carter products accused of infringement are RISE Super Gel-Regular and RISE Super Gel-Lime.

Johnson's claim for patent infringement is based on its ownership of the Monson Patent, issued November 17, 1970 to inventor James A. Monson, the patent which protects Johnson's Edge brand post-foaming shaving gel products, and on Carter's manufacture and sale of the accused RISE Super Gel post-foaming shaving gel products.

Johnson's claim for unfair competition is based on its use of its allegedly distinctive trade dress for shaving gel products sold under the Edge brand and Carter's use of an allegedly similar trade dress for shaving gel products sold under the RISE Super Gel brand.

Johnson's claim for false advertising is based on use by Carter of allegedly false or misleading advertising claims that the RISE Super Gel products are preferred by consumers two to one over the Edge products.

Carter's Answer denies the material allegations of the Complaint.

As affirmative defenses and counterclaims raised in the Answer and Pretrial Order with respect to the patent issues, Carter claims that it does not infringe the Monson Patent and that the asserted claims are limited by file wrapper estoppel; that the patent is invalid or unenforceable because (i) the subject matter was obvious to a person of ordinary skill in the art, (ii) the patent does not contain sufficient disclosure to enable a person of ordinary skill in the art to practice the invention, (iii) the asserted claims are overly broad and embrace inoperable gel post-foaming compositions and (iv) Johnson committed a fraud on the United States Patent and Trademark Office or breached its duty of candor and was guilty of inequitable conduct during the proceedings which led to the grant of the Monson Patent.

In response to the unfair competition and false representation claims, Carter alleges that the shape, configuration, appearance and some colors of the Edge packages are functional; that Carter's use of the RISE trademark and logo was prior to the Edge trade dress; and that Johnson's claims are precluded by unclean hands, estoppel, waiver or other equitable grounds because, Carter alleges, Johnson's own conduct has been inconsistent with the standards which it seeks to impose.

Carter counterclaims for a declaration that the Monson Patent is invalid and not infringed and Johnson's Reply denies the material allegations of the counterclaim.

Johnson further seeks an accounting for damages, injunctive relief and an award of attorney fees and Carter seeks an award of attorney fees.

By agreement of the parties, approved by the Court, the liability issues set forth above are to be resolved prior to any accounting on damages.

Pursuant to Judge Goettel's Orders of July 27, 1981 and August 27, 1982, the antitrust-related issues raised by Carter in its affirmative defenses and second counterclaim are reserved for a separate, subsequent trial, if such were necessary.

## THE FACTS AS THEY RELATE TO THE PATENT ISSUES

*Background and State of the Art Before the Monson Patent*

In ancient times beards were generally considered as signs of strength and manhood. The beard was carefully cherished and its removal was viewed as degrading punishment. However, early Egyptians commonly shaved their beards except while in mourning and, with the Jews, an unkempt, neglected beard was viewed as indicative of grief. It is reported that in Greece the beard was universally worn until the 4th century B.C. Then Alexander the Great ordered his soldiers to shave as a precaution against being seized by their beards in combat.[1]

The historian, Pliny, writes that the first Roman to shave on a daily basis was the great 3d century B.C. general, Scipio Africanus. Over the span of history great men opted both ways. Most biblical figures, *e.g.*, Christ, Moses are depicted as bearded. Caesar and Napoleon apparently shaved. Washington was clean-shaven; yet Lincoln, while President, was bearded. Grant and Lee were bearded. Wilson and Pershing were beardless.

With some notable exceptions, most western men abandoned the custom of wearing beards after World War I. The manufacture of razors and razor blades became big business in the United States. The Court well remembers how, in youth, he sat close by the radio, with the male elders, listening to the live blow-by-blow accounts of the great world heavy-weight championship bouts just before our entry into World War II. They were brought to the living room, directly from ringside, by a razor blade manufacturer.

But, no matter how great the man, or how sharp the blade, be it straight, safety or disposable, the shaving of the male beard is an excruciatingly painful task unless the face is abundantly moistened and lathered. (The Court notes that electric razors are an exception to this rule.)

Just as razors and razor blades became big business so too did the preparation of shaving soaps and shaving creams. That is what this case is about—two shaving creams, Edge and RISE Super Gel.

In 1967, Johnson became interested in entering the shaving cream field because it sought new products to help the company grow. Continued growth was considered important by Johnson management.

Till then Johnson had been active in the areas of floor waxes, furniture polishes, automotive waxes, insecticides and industrial products. Johnson had not sold any personal care products in the United States.

Work toward the development of a shave cream product was initiated at Johnson on March 14, 1967 by the issuance of a new product proposal approved by the Vice-President of Household Products, a Group Product Manager, the Vice-President of Research and Development and Samuel C. Johnson, President of the company.

The initial proposal specified a product "that goes on the face as a liquid for maximum wetting and then turns to a foam under its own power." When the proposal was made, it was only a concept, since Johnson had not done any development work on the idea.

A research project was started at Johnson in response to the new product proposal. The project number 480 was assigned for accounting and informative purposes. The objective of the project, i.e., a liquid shaving composition with delayed foaming properties, was reflected in the research and development project form in the same language used in the new product proposal form.

James A. Monson, a 27-year old chemist in Johnson's development group, was put in charge of the project. Prior to his assignment to that project, he had been authoriz-

---

**1.** Much of the historical material concerning Beards may be found in Funk & Wagnall's Stan- dard Reference Encyclopedia, vol. 3, 1959.

ed to devote large portions of his time to other exploratory projects of his own choice in the personal care field, such as creams and lotions.

*State of the Art in 1967*

In the 1960's, a number of companies were active in the shave cream market, including Gillette, Carter-Wallace and Colgate-Palmolive, among others. All of the aerosol shave products offered by those companies were basically the same. They were of the instant-foaming type. In those products, the propellant was a liquid which would separate out in the can. To dispense the product, the user had to shake the can to disperse the propellant, then press the button on the can. The liquid propellant provided the force to push the product out of the can. Then, as the product emerged, the liquid propellant would rapidly change to a gas and make the foam. None of those products was "post-foaming" and none was a gel.

In attempting to meet the project objectives, Mr. Monson first tried to prepare slow-foaming liquid compositions by replacing the conventional fast-boiling propellants with ones that boiled more slowly. The liquid products he obtained gave poor foams, caused burning of the skin, did not shave well, started foaming before they were applied to the face, and were too runny. To combat the runniness problem, he tried thickening up the liquid compositions. These products had less severe runniness problems if they were thickened a great deal, but the lather produced was dry and flaky and not good for shaving. They did not meet the objectives of the project. After about six or seven weeks of working with various modifications, Monson concluded that liquid products were not going to work. He then considered the approach of working with gels. It was approximately May 11, 1967 that Mr. Monson decided to abandon the project objective of a liquid composition and purposely explore gels.

A gel is a colloidal system that does not flow until stress is placed on the system. As a practical matter, a gel does not flow. After deciding to explore the idea of pro-

ducing a gel product, Monson did a great deal of exploratory work learning about soap gels and now to form them, using shaving cream ingredients. He found that he could make gels using soap, water and a propellant, or an oil-type material which simulated the propellant.

He found that those gel compositions solved some of the problems he had been having. The gels were not runny. They provided delayed foaming since foam formation did not occur until the gel was spread. However, their shaving properties were not good and it was difficult to control the consistency of the product. The soap gels tended to be either very rigid, and therefore difficult to spread smoothly, or so loose that they were runny.

Mr. Monson added water-soluble polymers, or gelling aids, to his compositions in an attempt to modify the consistency of the soap gels. He found that by including the water-soluble polymers, he was able to achieve desired consistency and obtain a gel that was easily spread on the face. In addition, he found that lubrication was improved because of the presence of the polymer. The water-soluble polymers were relatively large molecules consisting of a number of repeating units. They had the ability to bind up and hold many of the relatively smaller water molecules.

On July 10, 1967, Monson prepared a number of experimental samples for placement with Johnson employees to obtain their evaluation of his gel product. The product contained soap, water, the water-soluble polymers Klucel and Carbopol and a mixture of butane and pentane as the post-foaming agent.

Subsequently, arrangements were made to conduct evaluations among consumers with later prototypes developed by Mr. Monson. On August 31, 1967, he prepared the "First Prototype for Consumer Testing-Outside." It was a post-foaming gel containing water, soap, the Klucel and Carbopol polymers and a post-foaming agent. That formulation was the one to be used for the first consumer testing of the product and was included in the Monson Patent

as Example 1. The first actual placements of product with consumers occurred on November 13, 1967, the same day the Monson Patent application was filed.

*Prosecution of the Monson Patent Application*

The Monson Patent Application was filed in the United States Patent and Trademark Office ("USPTO") on November 13, 1967 as application Serial No. 682,479. The application was assigned by the USPTO to be reviewed by Patent Examiner W.E. Schulz in its "Art Unit 165."

Mr. Schulz reviewed the Monson application and conducted a search of the USPTO collections of prior art on September 16, 1969.

In the USPTO, all of the patents are classified and organized according to the type of invention involved. They are divided by subject matter into classes which are further sub-divided into sub-classes. All of the patents in the particular class and sub-class are stored together in numerical order. They are broken down into manageable terms that identify materials within those classes. In doing a patent search, a practitioner consults the USPTO Manual of Classification, finds the relevant classes and sub-classes for the particular subject matter and reviews the patents collected in those sub-classes.

On November 5, 1969, Mr. Schulz issued an "Official Action" in which he made a number of objections to the claims of the Monson application. Under heading "I" of that action, he rejected the claims as not defining the invention with sufficient particularity and distinctness, as required by 35 U.S.C. § 112. He objected to some of the technical expressions used in the claims and to the absence of numerical ranges for the separate ingredients. That rejection was directed to the wording of the claims and was not based on patentability over prior art.

The November 5, 1969 Official Action also contained, under the heading "II" (at page 48 of the USPTO official record), a rejection of the claims under 35 U.S.C. § 103 (i.e., an "obviousness" rejection) as being unpatentable over Bluard, U.S. Patent No. 2,995,521, in view of Friedenberg, U.S. Patent No. 3,240,396. The Examiner stated that the Bluard patent taught post-foaming compositions containing water, soap, post-foaming agents and a "jellifying agent." He contended that it would be obvious to substitute the Monson gelling aids for the jellifying agent of Bluard because Friedenberg showed "said agents are well known for the same purpose in the same type of compositions i.e. forming shaving compositions." The Examiner also cited Spitzer, U.S. Patent No. 2,655,480 and Colgate, British Patent No. 838,913 "to show the state of the art" and to show that other ingredients were also known in shaving creams and, therefore, obvious.

Mr. Monson's attorney held a personal "interview" (i.e., a face-to-face discussion) with Patent Examiner Schulz on December 19, 1969 to discuss the rejections made in the November 5, 1969 Official Action and the information the Examiner wanted in order to determine the patentability of the Monson claims over the prior art. As required by the Rules of Practice before USPTO, the substance of that interview was recorded and filed in the official record, in the "Amendment" filed May 4, 1970. In the May 4, 1970 Amendment, the attorney introduced into the application a claim (identified as Claim 31) which essentially became claim 1 of the Monson Patent. All of the claims of the Monson Patent are dependent upon claim 1. That claim states as follows:

1. A cleansing or cosmetic composition in the form of a stable, post-foaming gel consisting essentially of about 40–90% by weight water, about 4–25% by weight water-soluble soap, about 0.5–12% by weight volatile liquid post-foaming agent selected from the group consisting of saturated aliphatic hydrocarbons, halogenated hydrocarbons and mixtures thereof, and about 0.01–5% by weight of at least one water-soluble gelling agent which forms in said composition, a gel having a yield value sufficiently

high to substantially restrain said composition from foaming for at least about 60 seconds, under static ambient conditions.

Defendant Carter denies that the accused products meet certain requirements of the claims, namely: (1) that at least one water-soluble gelling agent be present which forms in the composition a gel, (2) that the water-soluble gelling agent be present in a concentration within the range of "about 0.01–5%" by weight of the total composition, and (3) that the gel composition so formed must substantially restrain foaming for at least about 60 seconds, under static ambient conditions.

As recounted in the May 4, 1970 Amendment, during the December 19, 1969 interview the Patent Examiner, having been apprised of the differences between the Monson invention and the Bluard and Friedenberg patents, requested a comparison of the shaving performance of: (i) the product of one of Monson's examples; (ii) the same example modified by eliminating Monson's water-soluble gelling aids and replacing them with Bluard's "jellyifying agent," aluminum octoate; and (iii) the product of any one of Bluard's shaving cream examples, with tentative agreement being reached that the comparison should be based on Monson's example 1 and Bluard's example 10. The Patent Examiner suggested the comparisons be made by submitting the formulations to panels of men who would shave with them and indicate their preference.

Johnson complied with that request and carried out the requested comparisons. Insofar as items (i) and (ii) requested by the Examiner were concerned, no difficulty was encountered in preparing the compositions. Mr. Monson did that work. The original Monson composition and the samples modified by using Bluard's agent were given to Mr. Robert Hoffmann, a person qualified to carry out evaluations of shaving creams. As reported in Mr. Hoffmann's declaration dated May 1, 1970, he placed the products with panels of shavers. In all, 22 men compared the original Monson example formulation against the modified version. All 22 preferred the former, the most commonly stated reasons being ease of use and lathering properties.

It was found that when Bluard's example 10 was carried out, the product became so hard it could not be stirred in a tank. An alternative procedure was worked out involving mixing by hand in an open vessel. The product obtained was so stiff and hard it could not be dispensed from a can and was therefore packaged in a collapsible tube.

Because of the difficulties with Bluard's example 10, Johnson tried to duplicate his example 11. That preparation work was done initially by Mr. Monson, but the products he obtained caused such severe skin irritation that few of the panelists could keep them on long enough to shave with them.

After that burning reaction was reported, Mr. Monson checked his procedure, found he had made a minor error in calculating the amounts of three of the ingredients, and repeated the preparation. Mr. Wilder, another Johnson chemist, tried a modification of the procedure followed to see if that might make a difference. Both of those products caused the same intense burning sensation, and were therefore not submitted for panel testing. Those difficulties were reported to the Patent Examiner.

Finally, Johnson undertook to prepare Bluard's example 12. The preparation was carried out and the product was packaged in Sepro cans.[2] However, it became so

**2.** The Sepro can provides advantages over both the conventional aerosol container and the piston can with respect to the dispensing of post-foaming gel type products. The Sepro can eliminates cavitation, which is the sudden formation and collapse of bubbles making the product uneven. It allows for the uniform discharge of the post-foaming product and permits a post-foaming gel product to be totally dispensed in a uniform way. Traditional aerosol dip tube containers and piston cans are not suitable for dispensing gels. The Continental Can Company was granted U.S. Patent No. 3,433,391 on the Sepro can on March 18, 1969.

thick and salve-like in the can that it did not come out when the button was pushed.

Johnson's attorney explained all of this to the Patent Examiner in the papers filed and during a second personal interview on May 4, 1970. The Examiner stated that he did not disagree with Johnson's interpretation of Bluard, that the content of the declarations was adequate, and that he considered the claims allowable. Moreover, Bluard taught the use of an oil soluble gelling agent whereas in Monson the gelling agent is water soluble.

On May 6, 1970, two days after Johnson's attorney filed the arguments and supporting declarations and interviewed him, Patent Examiner Schulz made a second search of the pertinent prior art classifications to ensure that no relevant art had been overlooked.

In July, 1970, the attorney became aware of an additional patent which he believed the Patent Examiner might wish to consider in connection with the Monson application, Gerstein U.S. Patent No. 3,485,915. He promptly took steps to send the Examiner a copy of that newly-found patent plus copies of all of the other prior art references considered during its prosecution.

During the prosecution of the Monson Patent application, some forty prior art references were cited by and to the Patent Office.

The Monson application was then allowed by the USPTO on September 15, 1970 and the patent was granted on November 17, 1970.

On June 27, 1969 Johnson acquired an exclusive license under the Bluard patent and on June 29, 1971, Johnson acquired full ownership of the Bluard patent. The assignment of the Bluard patent to Johnson was recorded in the Patent Office on September 10, 1971.

The Sepro can is an ordinary aerosol pressurized vessel with a corrugated plastic accordion like bag inserted in the can. The post-foaming gel product to be dispensed is placed within the accordion-shaped bag. No dip tube is needed on the valve. The propellant is introduced into

Defendant Carter did not enter the gel shave cream market until after August, 1978, when Bluard expired.

*Alleged Fraud and Inequitable Conduct*

Carter contends that Mr. Monson and the Johnson attorneys were guilty of fraud or inequitable conduct in failing to inform the Patent Examiner of the following:

a. the Pye patent;

b. the Naimark patent;

c. the fact that Johnson purchased a license and option to buy the Bluard patent, the principal reference relied on by the Patent Examiner;

d. the fact that Mr. Bluard demonstrated to Johnson's representative, during the course of the negotiations, a liquid hand soap that formed a good foam; and

e. the fact that another Johnson chemist, Douglas Dill, had made a slow-foaming liquid shave cream product before Mr. Monson started his work, and submitted a "conception sheet" claiming inventorship of that liquid product.

These five contentions will be taken up in the following three sections of this decision.

*The Pye and Naimark Patents*

U.S. Patent 3,072,536 to Pye was one of a number of references referred to in a literature search conducted by a Mr. Dickerson of Johnson's research library reported to Mr. Monson about April 18, 1967. The Pye patent was referred to in a handwritten note by the patent attorney employed by Johnson who filed the Monson application with the notation "patent on 2-step shaving using CMC." This attorney, Robert White, claimed he could not recall the patent, or the meaning of that note, or whether he considered it relevant to the Monson invention.

the container through a plug at the bottom and is usually a liquified propellant. As the valve is depressed, the liquified propellant squeezes the bag, thereby causing the post-foaming gel product to be dispensed.

Mr. Monson referred to U.S. Patent 2,833,693 to Naimark in a handwritten note dated February 15, 1968, with the notation "how do we stand w[ith] r[espect] t[o] this patent." He claims not to recall to whom that question was addressed. Mr. Monson was not asked questions about his view at the time of the significance of those two patents. Colgate British Patent 833,913 was a patent expressly cited by the Patent Examiner during the prosecution of the Monson Patent application "to show the state of the art." It describes shaving cream compositions to which water-soluble polymers have been added.

Dr. Stig Friberg testified as an expert witness for Carter. He is a leading expert chemist in the field of gels. He was asked to compare the cited Colgate patent to the allegedly withheld Pye patent. He agreed both disclosed the same kinds of polymers and ultimately concluded: "I think they are both very similar. I wouldn't be able to place any real difference between them."

■ Although the Patent Examiner was certainly aware of the Colgate British Patent, he did not reject any of the Monson claims as unpatentable over it. Accepting Dr. Friberg's testimony that there is "no real difference" between the Colgate patent and the Pye patent, there is no reason to believe that the Examiner would have considered the latter to be any more pertinent or that it would have added any relevant fact to the prosecution. The Court finds, therefore, that the Pye patent was not material to the prosecution of the Monson Patent.

■ The other portion of the Pye patent that Carter contends was relevant was the statement that a tendency to run or drip could be prevented by thickening a composition. However, Pye teaches only the formation of thickened lotions, not gels. Mr. Monson testified that he found thickened liquid compositions to be unsuitable as shaving preparations and, in this area, his testimony was not challenged. If such a disclosure were material, an article in the November 1957, Drug and Cosmetic Industry, by one Levy which was cited to the Patent Examiner by Mr. Monson's attorney correlates resistance to dripping with a gel having a sufficiently high yield value. In this respect the Pye patent would have contributed no relevant facts to the patent prosecution record, and was not material.

Dr. Friberg "basically agreed" that he believed the Pye and Naimark patents were relevant to the patentability of the Monson invention because they disclosed the use of gelling agents in cosmetic or toiletry formulations. An opinion to Carter by its outside patent attorney, John D. Foley, dated December 28, 1971 similarly listed Naimark as one of several references which teach the use of water-soluble gelling agents to form cosmetic gels such as shaving compositions.

■ The April, 1967 "Hercules Chemist" publication, cited to the Patent Examiner in the Monson Patent application as filed, specifically discloses the use of Mr. Monson's water-soluble cellulose gelling agents in cosmetic formulations, and U.S. Patent No. 2,798,503 to Brown, also cited in the Monson application as filed, discloses Mr. Monson's Carbopol-type gelling agents and their use in gel-like applications such as dentifrices, pharmaceutical creams and ointments. U.S. Patent No. 3,485,915 to Gerstein, another patent which Mr. Monson's attorney called to the attention of the Patent Examiner, teaches the use of a combination of Klucel and Carbopol (the combination used in the Monson Patent examples 1–4) to form gels in various cosmetic formulations. The Court finds that the Hercules Chemist publication, the Brown patent and the Gerstein patent, since they referred to the particular gelling agents indicated to be preferred in the Monson Patent application, were more relevant than the Naimark patent in respect to the disclosure of gelling agents used in cosmetic formulations. The Naimark patent would have added nothing of substance to the record before the Patent Examiner and was not material to the patent prosecution.

*Negotiations with Bluard*

■ In early 1968, Johnson arranged for William Rezac, an attorney in a Paris law

firm, to contact Mr. Estignard-Bluard concerning the purchase of rights under his U.S. Patent No. 2,995,521. Johnson took the position that it believed the pressurized gel shaving product it planned to introduce did not fall under the Bluard patent but proposed payment of a sum to avoid the possibility of infringement litigation by Mr. Bluard, who was apparently known to be somewhat litigious. Mr. Bluard at first rejected the offer. Negotiations with Mr. Bluard went on for more than a year. Mr. Bluard reduced his initial asking price but insisted on purchase of the patent because it provided tax advantages to him. The arrangement was ultimately made that Johnson would obtain an exclusive license and an option to purchase the Bluard patent for an initial payment of $7,500, extendable one year by another equal payment, the purchase price to be paid in a lump sum by July, 1971 or in five equal annual installments.

Johnson's attorney obtained the approval of his management to that arrangement "to protect Edge against any harassment by the patentee or his successor in title."

Johnson acquired its exclusive license and option under the Bluard patent on June 27, 1969. The exclusive license under an option to purchase the Bluard patent was recorded by Johnson in the United States Patent and Trademark Office on January 15, 1970.

During the negotiations and after the agreement was signed, Mr. Bluard tried, on several occasions, to interest Johnson in evaluating a liquid hand soap product and other ideas he was developing for products. At one time, in April, 1968, Mr. Bluard demonstrated a liquid hand soap product to the attorney, Mr. Rezac, at a meeting in France, and Mr. Rezac reported it produced a voluminous, rich foam. Johnson never followed up on Bluard's offers. There is no evidence that Johnson learned the composition of the liquid hand soap product.

Johnson made the payments required to keep its option alive. In June, 1971, Johnson exercised the option to purchase the Bluard Patent and made the first annual installment payment of $25,000 and acquired ownership of the Bluard patent on June 29, 1971. The assignment of the Bluard patent to Johnson was recorded in the United States Patent and Trademark Office on September 10, 1971.

After making two more of the annual installment payments, Johnson determined it did not wish to continue the agreement. In June, 1974, Johnson notified Mr. Bluard it was terminating the agreement in accordance with its terms, re-assigned the Bluard patent to him, and gave up all rights it had under that patent.

The Bluard patent was considered relevant by the Patent Examiner because of what it disclosed. That disclosure was not affected by who owned the patent or who had rights under it.

The liquid hand soap product was demonstrated to Mr. Rezac by Mr. Bluard in France, long after the Monson invention was made and several months after Mr. Monson's patent application had been filed in the USPTO. There is no evidence that the hand soap product corresponded to any of the examples of the Bluard patent.

The Court finds that neither the Bluard negotiations nor the Bluard hand soap demonstration was material to the prosecution of the Monson Patent application.

*The Dill Composition*

Before Mr. Monson's assignment to head up Project 480, Kenneth Duncan, a group product manager at Johnson, showed him a prototype slow-foaming liquid composition prepared by a Mr. Douglas Dill, a Johnson chemist working in the area of carpet cleaners. That slow-foaming composition was a cloudy liquid that separated into two layers. When shaken to disperse the contents and poured out into the back of the hand, bubbles gradually and slowly appeared. The Dill composition was not a gel. It was also not a "post-foaming" composition because it started to foam as soon as it was poured out on the hand. It was not a pressurized composition. Although the Dill composition was the idea that got Project 480 started, there

was no proposal to sell it. Moreover, the Dill composition did not meet the objectives of Project 480. It was thin and watery, difficult to apply to the face and shave with. It produced a foam typical of carpet cleaning compositions but was not suitable for shaving.

Mr. Monson had a subsequent discussion, the date of which he did not remember, with Mr. Dill about the composition of the product in a bottle. He learned that it contained a major amount of water, a synthetic detergent for foaming, and a small amount of hexane or heptane which caused the slow foaming.

Mr. Monson did not use the Dill composition in his work on Project 480 and he did not ask Mr. Dill to provide more of that composition for him. The Dill compositions were slow-foaming liquids, not gels although the formulation did contain Natrosol, a gelling agent. The Dill composition was not stable, was not a gel, and was not restrained from foaming for any appreciable time after being dispensed from its container. The Dill composition was not a Monson composition and was never considered by anyone to be worth marketing as a shave cream. Since it is not a gel, it is not a composition as defined in the Monson Patent.

The evidence presented to the Court concerning Mr. Dill's work was directed to the composition referred to at page 92 of his notebook. There is no convincing evidence connecting that composition with Mr. Monson. The Dill page 92 product was, as reflected in contemporaneous documents and as re-created by Carter and demonstrated in Court, a liquid (not a gel) composition that began foaming nearly immediately after being dispensed and continued slowly to foam for some time thereafter. It appeared to be, in its physical characteristics, essentially like the "slow-foaming liquid" composition disclosed in the Spitzer patent which the Examiner was aware of, Johnson having cited it to him. The Examiner did not deem Spitzer sufficiently pertinent to use as a basis for rejecting the Monson claims.

Mr. Dill referred to his page 92 composition in a conception sheet, in which he claimed to be the inventor of that liquid composition. Mr. Dill never, however, claimed to be an inventor of a post-foaming gel composition. Mr. Monson's uncontradicted testimony was that he abandoned the idea of a liquid product as being unworkable and proceeded on his own (after being told by Mr. Dill and other research personnel they could offer no help) to develop his post-foaming gel invention.

The Court finds that neither Mr. Dill's work nor his conception sheet was material to the prosecution of the Monson Patent application.

*Technical Witnesses*

Several technical witnesses testified on the patent issues. They were for plaintiff:

1. James Monson, the inventor of the patent in suit.

2. Professor John J. Sciarra, Executive Dean and Professor of Industrial Pharmacy at the College of Pharmacy of Long Island University.

3. Dr. Tim Konicek, a chemist employed by Johnson.

4. Dr. James Kurtz, a chemist employed by Johnson.

Defense experts were:

1. Mr. Walter C. Beard, an expert in the field of aerosol technology.

2. Mr. Robert James, a chemist employed by Carter.

3. Professor Stig Friberg, Curator's Distinguished Professor of Chemistry at the University of Missouri.

All of the experts were able and articulate. Johnson relied mainly on Professor Sciarra and Carter on Dr. Friberg.

*The Monson Patent*

The Monson Patent is owned by Johnson, under an assignment from James A. Monson. The statutory term of the Monson Patent extends to November 17, 1987.

The relevant claims of the Monson Patent in this litigation are claims 1, 3, 10, 13 and 16. Claim 1 is set forth at pages 9 and 10 supra. Each of claims 3, 10, 13 and 16

is dependent on claim 1 and adds further limitations to it.

The invention described in the Monson Patent is a stable, post-foaming gel comprising a major amount of water, a soap, a gelling agent and a post-foaming agent.

The function of the water was to provide the medium in which the gel was formed. The function of the water-soluble soap was to provide the primary gel structure, to produce foaming and lather and to contribute to lubrication during shaving. The function of the volatile liquid post-foaming agent was to provide the force for developing the foam on application to the face and to help make the gel by swelling up the soap structure.

It is the function of the water-soluble gelling agent which is at issue here. Plaintiff contends that its function was to modify the soap gel structure and provide lubrication. Defendant urges that the claims of the Monson Patent, properly interpreted, require the water-soluble gelling agent to cause the gel to form.

A "gel" is a material which has properties of the solid state and under certain conditions exhibits properties of the liquid state. It is made up of a somewhat fragile network that gives it the properties of the solid state under normal conditions. When sufficient force is applied to the gel, it breaks down that network and causes the gel to flow. The basic difference between a gel and a liquid is that, in a liquid, the molecules are free to move whereas in a gel the molecules are held in a structure and will not flow until some minimum force is applied. A gel will not flow or pour under reasonable, ordinary conditions. All gels are colloidal systems, meaning that the individual particles, droplets, fibers or sheets contained in them are very small.

"Yield value", as the term is used in the Monson claims, is the minimum force required to break down the solid-like structure of the gel and cause it to behave as a liquid. This is a characteristic property possessed by gels. It is a measure of the rigidity or strength of a gel. That charac-teristic was important in the Monson invention.

A "post-foaming" gel is one that, when dispensed, is relatively free from foaming and remains that way until applied to the face, and then foams upon spreading on application.

The two main factors which determine whether a composition will be post-foaming are the pressure generated by the volatile liquid post-foaming agent and the viscosity or consistency of the composition.

Claim 1 of the Monson Patent states that the gel will remain substantially free from foaming for at least about 60 seconds under static ambient conditions. The restraint on foaming was important because the object was that the product would not foam until it was applied to the face. Sixty seconds was not a critical time limit but was chosen as a good, practical length of time to permit the product to be dispensed into the hand and applied to the face. Static ambient conditions were prescribed and defined in the patent because foaming would be faster if the gel were spread or exposed to higher temperatures or lower pressures. The patent defines static ambient conditions as one atmosphere of pressure, 63°F, and conditions substantially free from shearing tension.

Claim 1 of the Monson Patent refers to the patented composition as a "stable" post-foaming gel. The word "stable" means the composition does not separate with time.

The claim defines the post-foaming agent as a volatile liquid. "Volatile" means a liquid that rapidly evaporates.

The descriptive portion of the Monson Patent further describes the invention in greater detail. It describes the "Sepro" can, an aerosol container in which the product is contained in an accordion-pleated plastic bag and in which a separate propellant outside the bag and inside the can collapses the bag and expels the product when the button is pushed. The Sepro can was a preferred container for the Monson post-foaming gels.

The water-soluble gelling agents described in the Monson Patent are water-soluble polymers. There is no distinction between the terms "gelling agent" and "gelling aid" in the Monson Patent; they are used interchangeably. In general the more gelling aids used, the stronger the gel.

Some ingredients are employed in the gel to modify the esthetics or the purpose for which the gel is used, such as dyes, fragrances, emollients, humectants and preservatives. Those ingredients may also, as a by-product, slightly modify the gel characteristics.

*The Accused RISE Super Gel Products—General Background and Undisputed Facts*

Carter is not licensed under the Monson Patent. The RISE Super Gel products are now being sold by Carter and have been sold by Carter in the United States and within the Southern District of New York since January 5, 1981. The RISE Super Gel products are and have been gels with delayed foaming properties and they have a yield value.

The RISE Super Gel products contain water in an amount between 40 and 90% by weight and water-soluble soap in an amount between 4 and 25% by weight. The water-soluble soap present in the RISE Super Gel products is a water-soluble salt of a fatty acid, specifically palmitic and myristic acid.

The RISE Super Gel products contain and have contained, since the first sale thereof, a volatile liquid post-foaming agent in an amount between 0.5 and 12% by weight. The post-foaming agent used in the RISE Super Gel products is, and has been since the first sale thereof, a mixture of isobutane and isopentane, which are aliphatic hydrocarbons having 4 or 5 carbon atoms, respectively.

The RISE Super Gel products contain, as ingredients, two water-soluble polymers sold under the trademarks "Polyox" and "Carbowax." The Polyox ingredient is the one designated "PEG–90M" and is the material closest to the "coagulant" grade of that material. The Carbowax ingredient is the grade sold under the trademarks "Carbowax 8,000" or "Carbowax 6,000" or the generic designation "PEG–150". The combined concentration of Carbowax and Polyox in the RISE Super Gel products is 6.532% by weight of the total composition.

The RISE Super Gel products are now and have been, since June, 1980, manufactured for Carter by Aerosol Services, Inc., located in City of Industry, California. Aerosol Services, Inc. manufactures, and has manufactured, the RISE Super Gel products in accordance with the formulas, procedures and product specifications established by Carter.

It is clear that Carter's RISE Super Gel-Regular product infringes the Monson Patent. Carter's RISE Super Gel-Lime product also infringes that patent.

Carter contends that the accused RISE Super Gel products are a different kind of gel from those defined by claim 1 of the Monson Patent. Dr. Friberg divided gels into two principal categories, which he called "forced gels" and "natural association gels." He characterized a "forced gel" as one prepared by adding a high molecular weight polymer to a system, and a "natural association gel" as one formed by the natural interactions of its components. Dr. Friberg described gels formed from soap and water as being representative of what he called "natural association gels."

Gels are formed in systems containing water and soap because soap molecules have a head, called a polar group.

In order to be a "forced gel", as Dr. Friberg used that term, a giant polymer molecule is present in order to form the gel system, and the polymer constitutes the network which forms the gel. In a "forced gel" the presence of a polymer is necessary to form the gel. In a "natural association gel" it is not. According to Dr. Friberg, there is no natural, or soap, gel structure present in a forced gel system because the giant polymer molecules could not be accommodated in the soap gel structure.

Dr. Friberg testified that, in his opinion, the gel is formed in the RISE Super Gel products by the interactions and ordering influences of the soap, water and post-foaming agent, and that it is a "natural association gel." He concluded that a gelling agent is not required to form the gel in the RISE Super Gel products. He described the structure of that gel as being a layered or "lamellar" one.

Dr. Friberg concluded that the PEG–90M and PEG–150 ingredients do not contribute to the formation of the gel in the RISE Super Gel products. The basis for his conclusion was that a gel is formed when they are present and when they are absent.

He concluded that the gels of the Monson Patent were "forced gels" and that he had not found in the patent a description of "natural gels." Dr. Friberg's interpretation that the Monson Patent defines a "forced gel" was based on his understanding that the gelling agent was required to form the gel. Dr. Friberg had not used the terms "forced gels" and "natural association gel" before this litigation.

Mr. Monson testified that one of the functions of the soap component in his invention was to provide the primary gel structure, and that the water-soluble gelling agent was used to modify that structure. Both Mr. Monson and Dr. Sciarra pointed out that the Monson Patent describes the soap component as being used to "form the gel" and keys the amount of soap used to that required to form the gel.

Dr. Friberg testified that the soaps used in the Monson Patent are ones which are capable of forming natural association gels at concentrations of about 5 to 30 percent, and that the patent discloses to use them at a range of 4 to 25 percent. Dr. Friberg stated that the amount of soap required to form a gel differs for different soaps. The Monson disclosure means that no critical amount can be stated which would apply to every conceivable soap, and the amount to be used must be determined for each soap.

The RISE Super Gel products contain about 12 percent soap. Examples 1–4 of the Monson Patent contain 12.2–14.5 percent soap. Both the RISE soaps and the Monson soaps are amine soaps of fatty acids. The soap level in RISE Super Gel is almost identical to the levels used in the Monson Patent examples. In addition, the RISE Super Gel products use the same kind of post-foaming agent as the Monson Patent examples and in very similar amounts. Further, the amount of water in the RISE products is almost identical to the amount used in the Monson examples.

The Monson Patent discloses that, among other things, synthetic resins generally used as thickeners in cosmetic and pharmaceutical preparations can be used as gelling aids or gelling agents in the practice of the invention.

The Polyox or "PEG–90M" ingredient in the RISE Super Gel products is a water-soluble resin, specifically an ethylene oxide polymer of high molecular weight.

According to Carter's manufacturing specifications, the Polyox, or PEG–90M, used in the RISE Super Gel products is the "coagulant grade" of that material. Johnson had developed proposed commercial post-foaming gel products in which Polyox was used as the gelling agent. The Carbowax ingredient used in the RISE Super Gel products is known as PEG–150 or Carbowax 6000, or Carbowax 8000. It is a water-soluble "polyethylene glycol" (i.e. a polymer of ethylene oxide) having a molecular weight of about 8,000. In the literature published by the manufacturer of that polymer, it is recommended for use in cosmetic formulations such as creams and lotions.

Dr. Friberg testified that the Monson Patent points out that the yield value of the gel can be modified by the ratio of the soap to the gelling aid and the ratio of gelling substances and other organic additives. The higher the yield value, the stronger the gel.

Dr. Sciarra concluded that the Polyox and Carbowax ingredients of the RISE Super Gel products are gelling aids or gelling agents within the meaning of the Monson Patent because, when they are included,

the yield value of the gel formed is substantially higher, and the Monson Patent discloses that the yield value is affected by that component.

Dr. Friberg concluded that the Polyox polymer does affect the gel structure of the RISE product by relaxing some of the dislocation patterns in it and thereby "probably" affects the strength of the gel. He did not know whether the Carbowax polymer did or did not strengthen the gel. Dr. Friberg testified that Polyox and Carbowax were not equivalents of Carbopol and Klucel.

The Monson Patent discloses that the gelling agents can be used in amounts as low as about "0.01–5% by weight ..."

Mr. Hans Breuer, a chief chemist at Carter, wrote memoranda in which he characterized the functions of the Carbowax and Polyox ingredients in the RISE Super Gel products. On July 30, 1979, Mr. Breuer wrote a memorandum in which he compared the ingredients in the RISE gel product with the ingredients in the Edge product. In that memorandum, Mr. Breuer concluded that the Edge product contained a "Cellulose Polymer which acts both as a lubricant and gel modifier." Correspondingly, the function he attributed to the RISE Carbowax polymer was "Used to modify gel structure and feel of the product" and he characterized the RISE Polyox polymer as "acts as a friction reducer."

Mr. Breuer wrote another memorandum on June 24, 1980 in which he characterized the Carbowax ingredient as the "gel stabilizer" which "helps hold the water in."

■ The Court concludes, based on the evidence cited from pages 1295–1296 *supra*, that the Carbowax and Polyox ingredients of the RISE Super Gel products are "at least one ... gelling agent" as the term is used in Claim 1 of the Monson Patent.

### Is RISE Super Gel Restrained From Foaming For At Least About Sixty Seconds?

Dr. Sciarra tested several samples of RISE Super Gel to determine whether they were restrained from foaming for at least about 60 seconds under "static ambient conditions" as that term is defined in the Monson Patent. The samples he tested were supplied by Carter during the pretrial proceedings, and were representative of the RISE Super Gel products as manufactured by Aerosol Services for Carter. The samples tested were, respectively, 2–3 months and 4–5 months old at the time Dr. Sciarra tested them. These samples were representative of the products as sold by Carter. Dr. Sciarra dispensed strips of those RISE Super Gel products alongside strips of a conventional foam product and observed them for several minutes at a temperature of 63°F under static ambient conditions. The RISE Super Gel products remained substantially free from foaming for more than 60 seconds. Those observations were recorded in still photographs taken at 30-second intervals. They show that there is no detectable amount of foam on the RISE Super Gel products after 60 seconds and little difference between those samples immediately after dispensing and after 60 seconds. Dr. Sciarra also examined the contents of an entire can of the RISE Super Gel product by dispensing strips until the can was empty and observing the foaming characteristics and physical characteristics of the dispensed samples. He found that the product was uniform throughout the can, and was stable in the sense that term is used in the Monson Patent.

Because of the phenomenon of permeation, the foaming characteristics of the RISE products change with age. The high pressure propellant initially placed outside the bag in the Sepro can, whose function it is to compress the bag and expel the product, gradually permeates through the bag and into the gel, causing it to foam faster. Carter's chief chemist, Mr. Breuer, testified that changes caused by this permeation become objectionable after six months. In order to extend the shelf life of its products, Carter revised its manufacturing procedure in March, 1981 to reduce the

**1298**

initial propellant level in the products inside the bag.

Carter, at trial, offered evidence through its aerosol technology expert, Mr. Walter Beard. The samples he tested ranged in age from 12 to 21 months at the time of the test and they did foam faster than 60 seconds. He, Beard, testified this was because of the age of the cans he tested and the permeation problem. His tests, therefore, did not represent the state of the RISE products as they are manufactured.

The Court concludes that the RISE Super Gel products are substantially restrained from foaming for at least about 60 seconds as manufactured for and as sold by Carter.

### Do The Accused Products Contain About 0.01–5% Gelling Agent?

Claim 1 of the Monson Patent states that the water-soluble gelling agent should be present in the amount of "about 0.01–5% by weight." The combined total of Polyox and Carbowax in the RISE Super Gel products is 6.532 percent by weight. As discussed above, the numerical ranges were added to the claim to meet the Patent Examiner's objection to the wording of the claims. The Monson Patent specification, beginning at column 6, line 32, states that the gelling agents "may be employed in concentrations as low as about 0.01% by weight of the total composition to provide suitable gels. They may be included in concentrations as high as about 5.0% to obtain gels having substantially higher yield values."

The recited range for the gelling agent in the Monson Patent is quite broad. Literally, 5% is 500 times greater than 0.01%.

There was considerable dispute among the experts as to whether the word "about" could be taken to modify 5% in the phrase "about 0.01%–5% by weight." The Court finds that, in the context of the whole patent, in view of the language found in column 6, line 32, the word "about" does modify 5% in the phrase in question.

Dr. Friberg interpreted "about 5.0" to mean between 4.9 and 5.1 and in answer to a question from the Court testified that he was "hesitant about" whether "about 5.0" would "also be 4.8 to 5.2." Dr. Sciarra testified that in the range "0.01%–5%" the upper limit would be 10% to 12% "approximately." In the Court's view about 5% is not 10% or 12%. The question is, in the context of this litigation, whether 6.532% by weight is about 5%. That in the Court's view is here a question of law, not fact, and will be dealt with later on in this decision.

### The Question of Willful Infringement

■ Carter management has been aware of the Monson Patent since 1971. Carter contends that it decided to market RISE Super Gel in good faith believing, based on opinions of counsel, that the Monson Patent was invalid and would not be infringed by the RISE Super Gel products as manufactured and sold by Carter.

Johnson contends with respect to the validity of the Monson Patent that, although Carter relied on two opinions of outside counsel, the opinions were equivocal and that they were warned on December 28, 1971 "... there does exist the possibility that their risk is substantial." The December 28, 1971 conclusions of John D. Foley, Carter's outside and highly-regarded patent counsel, concerning infringement and validity of RISE vis a vis Edge are as follows:

1. The Rise gel product clearly infringes many of the claims of the *Monson* patent and "probably" infringes the relevant claims of the *Bluard* patent. Further experimental work is required before infringement of the *Bluard* claims can be ascertained.

2. There do exist patent defenses of invalidity of some merit against the *Monson* patent and the *Bluard* patent.

3. Until additional technical information is obtained, however, it is difficult to assess with reasonable certainty now meritorious such defenses are and in turn to advise Carter how substantial a risk they would be taking with respect to the Rise Gel product.

4. Until the information mentioned in 3 is obtained, Carter should know that there does exist the possibility that their risk is substantial and could turn out to be substantial even after such information was obtained.

Based on that opinion of counsel, the Court finds that Carter was on notice that there was a likelihood that the Monson Patent was valid and that the Carter post-foaming gel, then under consideration, might well infringe on Edge.

The former President and Chief Executive Officer of Johnson, William K. Eastham, testified for Johnson that Carter made a request of Johnson for a license under the Monson Patent. He said that Johnson was "willing to give Carter-Wallace a license for five percent of gross sales" but that Carter "felt that they could not meet those terms." This occurred in the period 1971–1972. Carter did not market a gel product during this period.

In subsequent years, Carter's in-house patent counsel communicated with top Carter management concerning the December 28, 1971 Foley opinion. In the late 1970's, Carter developed a slightly different formulation from the original 1971 RISE. Carter never sought the opinion of outside counsel concerning whether the late 1970's, very early 1980 RISE, infringed on the Monson Patent. It relied on opinions rendered by its inside-house patent counsel, particularly his February 28, 1980 view "that our current (RISE) formulas do not infringe upon the Edge claims."

The Court finds that Carter management was disingenuous in claiming to rely on this opinion without again seeking the views of outside counsel, particularly in view of the Foley opinion, p. 34–35 *supra* and the efforts of Carter to obtain a license under the Monson Patent.

## THE LAW RELATING TO THE PATENT ISSUES

*The Validity of the Monson Patent Under 35 U.S.C. § 103*

██ Under 35 U.S.C. § 282 every patent enjoys a presumption of validity. Invalidi-

ty of a patent under 35 U.S.C. § 103 must be proved by clear and convincing evidence or its equivalent by whatever forms or words it may be expressed. *Radio Corporation of America v. Radio Engineering Laboratories*, 293 U.S. 1, 8 (1934).

As the Court of Appeals for the Federal Circuit recently held:

The burden upon the challenger of validity under 35 U.S.C. § 282 is to introduce evidence of facts establishing invalidity (thus overcoming the presumption). *American Hoist & Derrick Company v. Sowa & Sons, Inc.*, 725 F.2d 1350 (Fed. Cir.1984). "That evidence, if it is to carry the day, must be clear and convincing." *Radio Corp. v. Radio Laboratories*, 293 U.S. 1, 55 S.Ct. 928, 78 L.Ed. 1453 (1934).

*Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co. et al.*, 730 F.2d 1452, 1459 (Fed.Cir.1984).

This is in accord with that court's holding in *Hughes Aircraft Co. v. United States*, 717 F.2d 1351, 1359 (Fed.Cir.1983):

A patent shall be presumed valid and the burden of persuasion is and remains always on the party asserting invalidity.

Accordingly, the burden is on Carter to prove, by clear and convincing evidence, that the patent is invalid.

A patented invention is invalid for obviousness if the differences between the subject matter patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. 35 U.S.C. § 103.

In *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966) the Supreme Court set forth the factual inquiries that must be made in determining whether the subject matter claimed in a patent was obvious under 35 U.S.C. § 103:

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the

claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or non-obviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

See also *Union Carbide Corp. v. American Can Co.*, 724 F.2d 1567, 1572 (Fed.Cir. 1984), [affirming a summary judgment of obviousness].

■ Such secondary considerations, when present, are to be considered as part of the determination of obviousness. *In re Sernaker*, 702 F.2d 989, 996 (Fed.Cir.1983). There is no question that the Edge product was a great success for Johnson commercially. Several of Carter's principal executives admitted that Edge's success motivated Carter to develop and market a gel shave cream. Edge was the only true gel shave cream on the market in 1980. (See particularly the testimony of John D. Mack, President of Carter Products, a division of Carter-Wallace, Inc. at p. 1498 of this trial record.)

■ In determining the issue of obviousness under § 103, the Court should disregard the teachings of the patent in suit and view the art as it existed when the invention was made. *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed.Cir.1983), *cert. denied*, — U.S. ——, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984); *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1543 n. 3 (Fed. Cir.1984).

The Supreme Court stated the rule in *Diamond Rubber Co. of New York v. Consolidated Tire Co.*, 220 U.S. 428, 434–35, 31 S.Ct. 444, 447, 55 L.Ed. 527 (1911).

Many things, and the patent law abounds in illustrations, seem obvious after they have been done, and, "in the light of the accomplished result," it is often a matter of wonder how they so long "eluded the search of the discoverer and set at defiance the speculations of inventive genius." [citing cases]. Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention.

In the *Rosemount* case, *supra*, 727 F.2d at 1544 the court observed that

... patent cases should not be mere games played with pieces of paper called references and the patent in suit. Lawsuits arise out of the affairs of people, real people facing real problems.

■ "Real world facts" pertinent to a determination of obviousness include: (i) whether others skilled in the art, and particularly the accused infringer, were led to the patented invention by the prior art relied on at trial or by what the patentee did; (ii) the extent of the commercial success of the invention; (iii) the fact that the patentee, on the strength of the invention, entered the market and supplanted the established sales leader; (iv) whether the patentee proceeded contrary to the teachings of the art; and (v) the accused infringer's praise of the invention. *Rosemount, supra*, 727 F.2d at 1544–46.

■ In assessing the "real world" facts, there is no better way to determine whether an invention was obvious than to see what persons skilled in the art actually did or failed to do at the relevant time. *U.S. Philips Corp. v. National Micronetics Inc.*, 550 F.2d 716, 722 (2d Cir.1977), *cert. denied*, 434 U.S. 859, 98 S.Ct. 183, 54 L.Ed.2d 131 (1977). The fact that the entire industry had gone in one direction is good evidence of what reasonably could be gleaned from the prior art. The fact that the patentee went in a different direction is strong evidence of invention. *United States v. Adams*, 383 U.S. 39, 51–52, 86

S.Ct. 708, 714, 15 L.Ed.2d 572 (1966); *Rosemount, supra,* 727 F.2d at 1544, 1546; *W.L. Gore & Associates, supra,* 721 F.2d at 1550; *Dewey & Almay Chemical Co. v. Mimex Co.,* 124 F.2d 986, 990 (2d Cir.1942). The whole shaving cream industry was going the way of aerosol instant-foaming shave products in the 1960's, *see supra* at 1286. Only Johnson, through the Monson Patent, went the way of gels.

■ The fact that the patentee used ingredients that were individually old or principles known in the art does not detract from the fact that invention may be found in combining them to produce a novel result. Judge Learned Hand observed, in *Reiner v. I. Leon Co.,* 285 F.2d 501, 503 (2d Cir.1960), *cert. denied,* 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 1268 (1961), *rehearing denied,* 366 U.S. 978, 81 S.Ct. 1918, 6 L.Ed.2d 1268 (1961):

> It is idle to say that combinations of old elements cannot be inventions; substantially every invention is for such a "combination": that is to say, it consists of former elements in a new assemblage.

The Federal Circuit followed the reasoning espoused by Judge Hand:

> That the claimed invention may employ known principles does not in itself establish that the invention would have been obvious. Most inventions do.

*Lindemann, supra,* 730 F.2d at 1462.

■ In determining whether combining elements individually known in the art was invention, the court should consider (i) whether, at the time the invention was made, the art, independent of the patentee, here Johnson, fairly suggested that those elements be combined in the precise manner defined by the asserted claims, and (ii) whether the Monson combination produced beneficial results which could not have been predicted from the knowledge of the art at that time.

> If ... a combination is novel, the issue is whether bringing them together as taught ... was obvious in light of the prior art.

*United States v. Adams, supra,* 383 U.S. at 50, 86 S.Ct. at 713.

■ The prior art references relied on by Carter do not, either individually or together, suggest the Monson post-foaming gel invention. The prior art relied on by Carter, including the Sepro can, were available for some years prior to the introduction of the Edge product. Carter, the acknowledged pioneer in aerosol shave creams, did not find it obvious to make a post-foaming gel product until after it was led to do so by the appearance and early success of the Edge product.

The differences between the prior art and the invention defined by the asserted claims, the availability of that art to all workers in the field, the failure of the established competitors (including Carter) in the highly competitive shave cream market to make the invention despite the incentive to do so, the admittedly unobvious performance benefits realized through the Monson invention, the impressive commercial success of the Edge product, the praise of independent commentators and the forebearance of competitors from infringing the Monson Patent all go to confirm that the Monson invention was not obvious at the time it was made to a person of ordinary skill in the art.

The subject matter as a whole defined by the asserted claims of the Monson Patent was not obvious to persons of ordinary skill in the art at the time the invention was made. The Monson claims meet the requirements of 35 U.S.C. § 103. Carter has failed to sustain either its burden of overcoming the deference due the Patent Office's decision or its burden of proving obviousness by clear and convincing evidence.

*The Monson Patent As It Relates To Sufficiency Of Disclosure And Operativeness Under 35 U.S.C. § 101 and § 112*

Section 112 requires that the patent conclude with one or more claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."

■ The evidence must be clear and convincing to overcome the presumption of validity to invalidate a patent under 35 U.S.C. § 112. The section requires a patent specification to contain sufficient description of the alleged invention so as to enable any person of ordinary skill in the art to make and use the invention in the best mode contemplated by the inventor.

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same and shall set forth the best mode contemplated by the inventor of carrying out his invention.

■ The test for compliance with the "how to make" and "how to use" requirements of § 112 is whether a person of ordinary skill in the art can make the disclosure work, without carrying out undue experimentation, using the knowledge and tools generally available to him on the date the patent application was filed. *W.L. Gore & Associates, supra*, 721 F.2d at 1556–57; *Philip v. Mayer, Rothkopf Industries, Inc.*, 635 F.2d 1056, 1063 (2d Cir. 1980); *In re Stephens*, 529 F.2d 1343, 1345 (C.C.P.A.1976); *In re Borkowski*, 422 F.2d 904, 908 (C.C.P.A.1970). There is no need for a manufacturing specification. There need not be a description of every nut, bolt and detail used in the practice of the invention. *Martin v. Johnson*, 454 F.2d 746, 751 (C.C.P.A.1972); *H.K. Porter Co. v. Gates Rubber Co.*, 187 U.S.P.Q. 692, 708–09 (D.Colo.1975).

■ The Court finds the "how to make" and "how to use requirements" are present in the Monson Patent.

Carter contends that the asserted Monson claims set forth no definition of the container for the product and cover inoperative or useless embodiments. Carter alleges that collapsible tubes and conventional aerosol cans cannot be used to package a post-foaming gel. The teachings of the Monson Patent are to the contrary.

It is undisputed that the Sepro can is best suited for packaging the Monson product. It is the preferred container. The patent makes this quite clear. Collapsible tubes and conventional aerosol cans do not work nearly as well as the Sepro can. They impose constraints on the physical properties of the gel product, i.e., its consistency or pressure, if used. These negatives do not, however, spell out inoperativeness. In *E.I. du Pont de Nemours & Co. v. Berkley & Co.*, 620 F.2d 1247, 1260, n. 17 (8th Cir.1980), the Court wrote

Perfection under all conditions is not required, whether the patent does or does not suggest that the invention is imperfect or inoperable under certain conditions.

An invention does not lack utility merely because the particular embodiment disclosed in the patent lacks perfection or performs crudely ... Nor is it essential that the invention accomplish all its intended functions ... or operate under all conditions.

*See* also *Oetiker v. Jurid Werke GmbH*, 209 U.S.P.Q. 809, 824 (D.D.C.1981).

Although the Monson composition does not work as well in collapsible tubes or conventional aerosol cans, Carter has not established that they are wholly inoperative containers for the Monson products. Carter has failed to sustain its burden of proof, by clear and convincing evidence, that the Monson Patent lacks an enabling disclosure or that the asserted claims embrace inoperative embodiments or that it otherwise fails to comply with 35 U.S.C. § 112.

### Fraud and Inequitable Conduct

■ Patent applicants have an uncompromising duty to bring to the attention of the Patent Office all facts concerning possible fraud or inequitableness underlying the applications in issue. *Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 999, 89 L.Ed. 1381 (1945).

The duty is a strict one. Although this rule is not to be questioned, it should not be interpreted in a way which imposes an unworkable standard on patent applicants and their attorneys.

... [T]he standard is not one of strict liability for innocent or even negligent omissions or misstatements before the Patent Office [citing authority]. Rather, to result in refusal to enforce a patent, the misconduct must be accompanied by "some element of wrongfulness, willfulness or bad faith" [citing cases].

*Pfizer, Inc. v. International Rectifier Corp.*, 538 F.2d 180, 186 (8th Cir.1976), *cert. denied*, 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977) and authorities collected and analyzed there. *See also Xerox Corp. v. Dennison Mfg. Co.*, 322 F.Supp. 963, 968 (S.D.N.Y.1971).

■ By their very nature charges of fraud or inequitable conduct are quite serious and the party making such assertions has a heavy burden.

In *Orthopedic Equipment Co. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1383 (Fed.Cir.1983), the Court stated:

Establishing that a patent was procured by fraud or with such egregious conduct as to render it unenforceable requires clear, unequivocal and convincing evidence of an intentional misrepresentation or withholding of a material fact from the PTO.

In *E.I. du Pont de Nemours & Co.*, *supra*, 620 F.2d at 1275, Federal Circuit Chief Judge Markey, sitting by designation, warned against allowing accused infringers using fraud allegations to divert the court from the main issues of infringement and validity.

■ The essential elements to establish fraud are intent and materiality.

As to intent, there is no evidence that Mr. Monson or any of his attorneys withheld any items from the Patent Examiner in bad faith, or with gross negligence, or in reckless disregard for truth, or with the intent to mislead. With regard to the Bluard negotiations and the Dill work, there is no evidence that anyone even considered their possible materiality. The only references to the Naimark and Pye patents were in short handwritten notes of Mr. Monson ("how do we stand with respect to [Naimark])" and Mr. White ("[Pye] patent on 2-step shaving using CMC"). Neither of those notes, the meaning of which the respective authors could not recall thirteen years later, evidences an intent to conceal or mislead. Nor do they exhibit an acknowledgement of materiality to the patentability of the Monson invention.

The official Patent Office record and contemporaneous documents indicate that when Johnson reported to the Patent Examiner the results of the work the Examiner had requested, it did so with care, explaining in detail the assumptions its scientists made and the problems they had and offering to do further work if the Examiner expressed doubts. When the Gerstein reference was noted, *supra* at 1289, late in the patent prosecution and after the Patent Examiner had communicated his willingness to allow the patent, Johnson's attorney promptly brought it and related art to the Examiner's attention and asked him to withhold allowance of the claims until after consideration of the new facts. Johnson's conduct in those instances exhibited good faith and compliance with the duty of candor. It argues against an inference of a wrongful state of mind.

Since there is no direct evidence of bad faith before it, the Court must examine the allegedly withheld items to determine if any was so material to patentability that an intent to mislead is to be presumed from the fact each was known to Mr. Monson or one or more of his attorneys.

On the issue of materiality, as it relates to defendant's contentions of fraud, Carter urges that Johnson committed fraud relative to the work of Douglas Dill, *see supra* at 1292–93, the Naimark patent, *see supra* at 1290–91, the Pye patent, *see supra* at 1290–91, and the Bluard patent rights and hand soap, *see supra* at 1291–92.

The Dill composition was not any more material to the patentability of Mr. Monson's invention than was the Spitzer patent which Johnson had cited to the Examiner, *see supra* at 1293. The Dill work did not acquire additional significance merely because it was internal to Johnson. While it was instrumental in getting Project 480 started, the invention made by Mr. Monson was a post-foaming gel, not a liquid composition like the Dill work. Suggestions by others that do not reveal the entire invention and how to achieve it do not negate invention by the one who carries the project forward to its successful conclusion. *Polye v. Uhl*, 328 F.2d 893, 898 (C.C. P.A.1964); *Amax Fly Ash Corp. v. United States*, 514 F.2d 1041, 1046–51, 206 Ct.Cl. 756 (U.S.C.C.1975). "[A]sking someone to produce something without saying just what it is to be or how to do it is not what patent law recognizes as inventing." *Morgan v. Hirsch*, 221 U.S.P.Q. 193, 195 (Fed. Cir.1984). The Dill work was not so clearly material that this Court should presume an intent to mislead because it was not mentioned to the Patent Office.[3]

The Pye and Naimark patents can be discussed together. Both are "soapless", non-foaming shaving compositions containing a water-soluble polymer. The Pye patent had no greater relevance to patentability than the Colgate British patent, or the Levy reference, both of which the Patent Examiner was aware of but did not use as the basis for rejecting the Monson claims. The Naimark patent was no more relevant to patentability than the Gerstein patent which Johnson cited to the Examiner. Gerstein disclosed cosmetic gels made with the combination of gelling agents preferred in the Monson application. The Patent Examiner did not consider Gerstein sufficient basis to reject the Monson claims. There is no basis for the Court to conclude that the Patent Examiner would have considered

Pye or Naimark important to his decision to grant the Monson Patent. Neither was material to the patentability of the Monson invention.

Insofar as the Examiner was concerned, the Bluard patent had relevance because it was a published reference. Its disclosure was not altered by who owned it or who had rights under it.

Johnson's negotiations for rights under Bluard was not inconsistent with the experimental results it provided to the Patent Examiner. The testimony and contemporaneous documents show that Johnson apparently doubted that its product was covered by the patent, but acquired those rights as a sensible business precaution to forestall the possibility of Mr. Bluard's bringing an infringement suit if and when the Edge product became successful.

Johnson's acquisition of a license under, and option to purchase, the Bluard patent, were not so material to create a presumption of bad intent. Moreover, both of Carter's outside counsel, Messrs. Farabow and Foley, and its house counsel, Mr. Clarke, were aware in 1970 that Johnson had acquired those rights, because Johnson had made it a matter of public record in the USPTO in January, 1970, before the Monson Patent was granted. Yet, none of those three attorneys, while looking for a basis to hold the Monson Patent invalid and unenforceable, suggested that Johnson had breached its duty of candor.

The demonstration of Mr. Bluard's liquid hand soap was also immaterial. If that hand soap was one of the compositions disclosed in the Bluard patent, the Examiner was aware of it. In any event this was not established by the evidence. The demonstration took place in Europe months after the Monson Patent application was filed. In this regard *see E.I. du Pont, supra*, 620 F.2d at 1264–65.

---

**3.** Under the so-called "Shop right" rule, *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 695 (1933) it would have been silly for Johnson to suppress the Dill work from the USPTO. Johnson would own the invention whether or not Dill was named as an inventor. Johnson could have, at any time, amended the Monson application or the issued patent to add Mr. Dill as an inventor (indeed, this Court could do so now if it were convinced that was the correct result.) 35 U.S.C. § 256.

■ Carter has failed to meet its burden of proving, by clear, convincing and unequivocal evidence, that the Monson Patent was procured by fraud or inequitable conduct.

### Infringement

■ Johnson bears the burden of proving infringement by a preponderance of the evidence. *Hughes Aircraft Co. v. United States, supra,* 717 F.2d at 1361.

■ "Literal infringement" is determined by comparing the accused composition to the words of the claim.

> In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

*Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950).

■ When "literal infringement" is not present, the Court must consider whether the accused composition nevertheless falls within the reasonable range of equivalents to be accorded the claim.

> But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for-indeed encourage-the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It

would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent system.

> The doctrine of equivalents evolved in response to this experience ... The theory on which it is founded is that "if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape." [citing cases]. The doctrine operates not only in favor of the patentee of a pioneer or primary invention, but also for the patentee of a secondary invention consisting of a combination of old ingredients which produce new and useful results, [citing cases], although the area of equivalence may vary under the circumstances.

*Graver Mfg., supra,* 339 U.S. at 607–08, 70 S.Ct. at 856 (footnote omitted); *Hughes Aircraft Co., supra,* 717 F.2d at 1361.

■ In particular cases, the ambit of the doctrine of equivalents may be circumscribed by the patentee's actions during the prosecution in the USPTO which resulted in the grant of a patent. To the extent the patentee voluntarily limited his claims by amendment of his claims to avoid the prior art, he is precluded from expanding them, by resort to equivalence, to recapture the surrendered subject matter. This limitation is known as "prosecution history estoppel" or "file wrapper estoppel." *Hughes Aircraft Co., supra,* 717 F.2d at 1362.

■ The fact that the asserted claims were amended to avoid prior art is not fatal to the application of the doctrine of equivalents. There is room for the recognition of equivalents which lie between the literal scope of the patent claim, and the teaching of the prior art that prompted the amendment although "file wrapper estoppel" prevents a patentee from recapturing claims he surrendered by amendment.

Here, the amendments to the Monson claims were made in answer to formal ob-

jections by the Examiner, not to avoid prior art. This can be seen by reading the file wrapper in the case, Plaintiff's Exhibit 20. The exhibit discloses that Johnson's attorney did not tell the Patent Examiner that the gelling agent alone caused the gel to form. Rather, the gelling agent is an essential component of the composition.

 "File wrapper estoppel" exists only when the restriction of the claim is based on avoidance of prior art. Estoppel does not arise when amendment is made to meet a rejection that the claim was indefinite or otherwise defective in its language under 35 U.S.C. § 112. *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 461 F.2d 66, 75 (3d Cir.1972), *cert. denied*, 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972). As Judge Ward explained, in *Leesona Corp. v. Varta Batteries, Inc.*, 522 F.Supp. 1304, 1332 (S.D.N.Y.1981):

> Filewrapper estoppel, however, does not arise where the claims were rejected for indefinite disclosure [citing 35 U.S.C. § 112] and not because they read on prior art [citing authority].

Since it is undisputed that the accused RISE Super Gel products are post-foaming gels containing the water, water-soluble soap, and post-foaming agent ingredients recited in the Monson claims, in the recited amounts, the infringement issues with respect to Monson Claim 1 are:

(i) whether the PEG–90M and PEG–150 ingredients of the Carter products correspond to "at least one water-soluble gelling agent" within the meaning of the Monson Patent;

(ii) whether the combined amount of 6.532% of those ingredients is within "about 0.01–5%" as recited in the Monson claims; and

(iii) whether the accused products are substantially restrained from foaming for at least about 60 seconds.

Those issues are also dispositive with respect to asserted Claims 3, 10, 13 and 16, all of which are dependent on Claim 1.

*Water Soluble Gelling Agent*

Carter urges that the gel in the accused RISE Super Gel product is of a fundamentally different nature than the gels of the Monson Patent. Carter's position is that RISE has a "natural association gel" while Edge has a "forced gel." If the Monson compositions were "forced gels", as that term was used by Carter's expert, the gel would not be formed if the gelling agent were omitted. The expression in the Monson claims, "forms in said composition a gel having a yield value sufficiently high ..." does not literally require that result. Such a construction would be inconsistent with the specification, which teaches that the soap, water and post-foaming agent also form the gel and contribute to its physical properties. The uncontradicted Monson testimony was that, as he developed the invention, the function of the gelling agent was to modify the properties of a soap gel that was either too rigid or too loose. The patent is consistent with that understanding.

During the patent prosecution, it was never suggested that the Monson claims avoided the prior art because they required the gelling agent to be the sole causative agent for the gel. In this regard it is important to note that Johnson had cited to the Patent Examiner a series of prior art references (among them the Gerstein patent, *see supra* at 1289–90, and the "Hercules Chemist" publication, *see supra* at 1291, and the Brown patent, *see supra* at 1291), disclosing cosmetic gels formed exclusively by the action of a gelling agent. The particular mechanism by which the Monson gels was formed was not critical in avoiding that reference.

Based on the evidence presented it is clear that the RISE Super Gel products parallel the Monson compositions. A comparison of examples 1–4 of the Monson Patent with the RISE Super Gel formula, shows that both contain essentially the same amounts of water, post-foaming agent and soap, and the chemical nature of those ingredients is very similar for both products. As Carter's expert, Dr. Friberg,

testified, the soaps disclosed in the Monson Patent are capable of forming what he called "natural association gels," *see supra* at 1295, when used in the amounts disclosed in the patent.

The RISE Super Gel composition, which Dr. Friberg characterized as a "natural association gel" does not form a gel until the post-foaming agent is added. The evidence at trial disclosed the same is true of the Monson compositions. The RISE Super Gel composition forms a gel when the Polyox and Carbopol are omitted. The Monson examples also form a gel when the Klucel and Carbopol ingredients are omitted.

Carbowax and Polyox meet the general definition of the gelling aid at Column 7, lines 37 et seq. of the Monson Patent. Both are water-soluble synthetic resins used as thickeners in cosmetic and pharmaceutical preparations. According to Monson Claim 1, the gelling agent forms, in the composition, a gel having a particular yield value, i.e., one sufficiently high to substantially restrain foaming for at least about 60 seconds. Based on Dr. Sciarra's testimony, when the Polyox and Carbowax ingredients are omitted from the RISE composition, the result is a less firm gel that begins substantial foaming in less than 60 seconds. When they are included, the product is a firmer gel that is restrained from foaming for more than 60 seconds. Similarly, when the gelling agents are included in Monson example 2, the resulting product is a gel that remains substantially free from foaming for at least about 60 seconds. When they are omitted, a gel is still formed, but it begins to foam much more quickly, in substantially less than 60 seconds.

Dr. Friberg testified, *see supra* at 1296–1297, that the Polyox ingredients probably affect the strength of the RISE gel. Carter's chemists said that the function of the Carbowax ingredient was to "modify" or "stabilize" the gel and the function of the Polyox ingredient was to provide lubricity. These are essentially the same functions performed by the Monson gelling agents.

The Court finds that the Carbowax and Polyox ingredients of the RISE Super Gel product are "gelling agents" within the meaning of Monson Patent Claim 1.

### "About 0.01–5%"

The combined amounts of Carbowax and Polyox add up to 6.532% in the RISE Super Gel product. The Monson claims were amended, during the patent's prosecution, by inserting the expression "about 0.01–5% by weight of at least one water-soluble gelling agent."

 Insertion of the numerical ranges was in response to the Examiner's objection to the wording of the claims under 35 U.S.C. § 112, not to avoid prior art. Accordingly, no file wrapper estoppel was created, *see supra* at 1306.

The Court has concluded, *see supra* at 1298, that the word "about" modifies both ends of the recited range.

The experts agreed it was known in the art that polymers differ greatly in their thickening ability, and that for polymers of identical chemical composition, more of one must be used of a lower molecular weight than of a higher molecular weight. This is taught in the Monson Patent. The Carbowax ingredient (used in the accused product at about 6.5%) is considerably lower in molecular weight than the Polyox ingredient (used at 0.024%) or the preferred gelling agents of the Monson Patent. The combination of Carbowax and Polyox, in the amounts used, perform the same function in the same way to give the same result as the gelling agents of Monson. The total amount of 6.532% is, therefore, equivalent to the range recited in the Monson claims. Additionally, the fact is that 0.01–5% is a broad range. It was nowhere indicated to be a critical one. 6.532% is literally "about 5%" in the context of this case.

In *Kolene Corp. v. Motor City Metal Treating, Inc.*, 440 F.2d 77 (6th Cir.1971), *cert. denied*, 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971), the Court found that a process which used 46–50% of a chemical

compound called "cyanate" infringed a patent claim that recited "between about 25 and 40% cyanate," both literally and under the doctrine of equivalents. Chief Judge Phillips observed, *Kolene Corp.*, 440 F.2d at 82–83:

> Applicants discovered the beneficial effects on the process of aeration of the bath. This was what they represented as their contribution to the art originally and they maintained that position throughout the prosecution before the Patent Office. By adding to the claim the operable percentage limits applicants did not disclaim those percentages that were equivalent thereto.

*See also Rich Products Corp. v. Mitchell Foods, Inc.*, 357 F.2d 176, 182 (2d Cir.1966), *cert. denied*, 385 U.S. 821, 87 S.Ct. 46, 17 L.Ed.2d 58 (1966). At page 182 of *Rich Products*, the Court wrote

> Under the "doctrine of equivalents," which applies to chemical substitutes, *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, at 607–09, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), the use by the appellants in this case of a substance which "performs substantially the same function in substantially the same way to obtain the same result" as the patented process, constitutes an infringement. *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, at 42, 50 S.Ct. 9, at 13, 74 L.Ed. 147 (1929). What is prohibited is not merely outright duplication, but also that more subtle duplication which is accomplished by a change in one of the non-critical aspects of the patent's teachings. If that were permitted, form would be elevated above substance, and literalness would triumph over fairness and good sense.

■ The RISE Super Gel products correspond to the "about 0.01–5%" recitation of Monson Claim 1, both literally and under the doctrine of equivalents.

### Substantially Restrained from Foaming for at Least About 60 Seconds

■ For the Monson Patent freedom from substantial foaming for a substantial time was considered important to permit the user sufficient time to apply the product to his face as a gel rather than as a foam. The 60 second figure was a practical one, not a critical limit. Since that language was added to the claims prior to any rejection by the Examiner and was not the basis for avoiding the prior art, Johnson could, if required, rely on the doctrine of equivalents to expand the claim beyond its literal terms. Having observed Carter's commercials, the Court is satisfied that it, too, stresses the application of its product to the face in gel form.

The evidence showed that the RISE Super Gel products meet the 60 second recitation at times relevant to this litigation—when it is manufactured for Carter and when Carter sells it. The foaming test carried out by Carter's expert was not particularly relevant since the product employed was 12–21 months old. It was undisputed that the product foams faster after a long period of storage because of the permeation problem. The product tested was not representative of RISE Super Gel at either of the times of manufacture or sale by Carter.

Dr. Sciarra's foaming tests were relevant and reliable. The RISE Super Gel samples he tested were representative of the product as it is manufactured for Carter and as Carter sells it to its customers. At both times, the RISE Super Gel product is substantially restrained from foaming for at least about 60 seconds.

### Conclusion

■ Carter is liable as an infringer for inducing infringement of each of claims 1, 3, 10, 13 and 16 of the Monson Patent by causing its supplier, Aerosol Services, to manufacture the RISE Super Gel products in accordance with the formula, process and specifications established by Carter. 35 U.S.C. § 271(b). Carter also infringes each of those claims by selling the RISE Super Gel products to its customers. 35 U.S.C. § 271(a).

## Willful Infringement

If a potential infringer has actual notice of another's patent rights, he has an affirmative duty to exercise due care to determine whether or not he is infringing. Carter certainly had knowledge of Johnson's claims under the Monson Patent. This affirmative duty includes, inter alia, the duty to seek and obtain competent legal advice from counsel before the initiation of any possible infringing activity. *Underwater Devices Inc. v. Morrison-Knudsen Co.,* 717 F.2d 1380, 1389–90 (Fed.Cir.1983); *Central Soya Co. v. Geo. A. Hormel & Co.,* 723 F.2d 1573, 1576–77 (Fed.Cir.1983).

Because an infringer claims to have relied on opinions of counsel he does not necessarily demonstrate good faith and he is not automatically absolved of willful infringement. The Court must examine (i) the substance of the opinions rendered, *Central Soya Co., supra,* 723 F.2d, 1576–77 (Nichols, concurring at 1581–82); and (ii) the adequacy of counsel's investigation. *Underwater Devices Inc., supra,* 717 F.2d at 1390.

The opinions on validity on which Carter relied were rendered by Messrs. Foley and Farabow in 1970. Carter admits in open court that "Those opinions were not very helpful. As a result Carter-Wallace decided not to go into the business." Mr. Foley's opinion was candid. He told Carter that he found it impossible to assess the merits of the invalidity defenses and that it faced the possibility of substantial risk.

Based on the Foley opinion a reasonable person would not understand that he could prudently act with confidence that a court would find the Monson Patent invalid. The Court concludes that Carter did not have such confidence because, after it received the Foley opinion, it dropped its plans to market a post-foaming gel product and abandoned its research project. Taking Carter's best case the Foley opinion simply said that there was a reasonably good chance the Monson Patent might be held invalid and that, if Carter were sued, he could make plausible arguments for in-

validity. While that was undoubtedly honest and objective advice, it did not provide a basis on which Carter could reasonably go forward with confidence, either in 1971 or in 1980, relying on the invalidity of the Monson Patent.

From the standpoint of validity, Carter had no opinion of counsel establishing its good faith in selling the accused product in the face of the Monson Patent.

In deciding to go forward with the accused product, Carter relied only on the opinion of its in-house counsel. This alone does not demonstrate a lack of good faith, but it is a factor to be considered. The burden lies with Carter to demonstrate it was justified in believing that its in-house counsel was capable of rendering an independent and competent opinion and that he took the steps normally considered to be necessary and proper in preparing an opinion. *Underwater Devices, supra,* 717 F.2d at 1390. House counsel did not have actual court experience in patent litigation. That is, of course, the arena where patent infringement questions are determined.

The in-house counsel opinions do not meet the standards set forth in *Underwater Devices, supra,* 717 F.2d at 1390. His opinions were conclusory in nature and did not contain a real analysis comparing and contrasting the potentially infringing RISE compositions with the patented Monson invention. There were no exhibits introduced to provide the missing detailed analysis. The attorney did not recall any single specific facts relied upon to support his conclusion.

Although the attorney was aware that the Polyox and Carbowax ingredients were water-soluble polymers used in thickened cosmetic and pharmaceutical preparations, and that Polyox had thickening power no experimental work was performed to determine what effect those ingredients had in the proposed product. *Cf. Central Soya, supra,* 723 F.2d at 1577.

Comparing the in-house attorney's memoranda with the 1970 Foley outside infringement opinion on the Monson and

Bluard patents (Mr. Farabow did not render an infringement opinion), it is apparent that house counsel did not take the steps normally considered to be necessary and proper. Specifically, what Mr. Foley did do, and the inside lawyer did not, was:

(i) record the formulation considered in the opinion;

(ii) provide a detailed analysis of that formulation against the invention defined by the claims of the patent; and

(iii) request appropriate experimental data to resolve technical questions.

Carter had no opinion on the question of infringement on which it could reasonably rely in good faith.

■ Carter did not fulfill its affirmative duty to exercise due care to determine whether or not it was infringing the Monson Patent. Accordingly, the Court holds that Carter's infringement was willful and deliberate.

### Attorneys Fees

■ The Court "in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. Although willful infringement may render the case "exceptional" under the statute. *Central Soya, supra,* 723 F.2d at 1577–78, the Court declines to find this an "exceptional case." Accordingly, Johnson is not entitled to recover its reasonable attorney fees and expenses. Such awards are to be made sparingly and not as a matter of course.

■ Further, the Court declines to "increase the damages" under 35 U.S.C. § 284.

The parties are directed to appear before the Court on March 13, 1985 to arrange for a schedule to be set for an accounting on damages.

### Injunctive Relief

■ Injunctive relief is available "to prevent the violation of any right secured by patent." 35 U.S.C. § 283. The Monson Patent is valid and infringed by the accused RISE Super Gel products. Further manufacture or sale of those products will irreparably harm Johnson by further eroding its statutory right of exclusivity. As the Court observed in *Smith International, Inc. v. Hughes Tool Co.,* 718 F.2d 1573, 1581 (Fed.Cir.1983) (footnote references omitted), *cert. denied,* —— U.S. ——, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983):

> The very nature of the patent right is the right to exclude others. Once the patentee's patents have been held to be valid and infringed, he should be entitled to the full enjoyment and protection of his patent rights. The infringer should not be allowed to continue his infringement in the face of such a holding.

Carter is hereby enjoined from any further infringement of the Monson Patent, including but not limited to any further manufacture or sale of the RISE Super Gel products.

### Findings Relating to the Unfair Competition and False Advertising Issues

In addition to the action for patent infringement Johnson alleges Unfair Competition violations and makes claims of false advertising against Carter under Section 43(a) of the Trademark Law, 15 U.S.C. § 1125(a)

### FINDINGS OF FACT

Carter was founded in 1880. Carter, through its Carter Products Division, has over the years invented, developed, manufactured, promoted and sold many leading personal care products, under some very well-known trademarked brand names. In addition to RISE, Carter produces Arrid antiperspirants and deodorants, Nair depilatories or hair removers, Pearl Drops tooth polish, Sea & Ski sun tan products, Carter's Little Pills and many other well-established trademarked products.

In 1949, Carter introduced RISE shaving cream. RISE was the first pressurized shaving cream marketed. Since 1949, Carter has marketed RISE in cans bearing a

distinctive logo and trademark consisting of four lower-case letters. Beginning in or about 1949, Carter began using the color green as a prominent part of the trade dress of RISE. Beginning in or about 1957, Carter has used green as the dominant background color in some flavors of RISE. Carter has extensively advertised RISE both on television and in other media. From 1949 to the time of this trial, Carter has expended approximately 40 million dollars in advertising for RISE. This advertising prominently displayed the trademark, logo, package and trade dress of RISE.

RISE has been for many years one of the leading brands of shaving cream in the United States. Beginning in or about 1957 and continuing to the present, the "rise" logo has appeared on some flavors of RISE in the form of four white, lower-case letters on a dark background. Since 1969 Carter has used the "rise" logo in the form of four white, lower-case letters on a black background.

Beginning in early 1969, Carter has packaged the lime flavor of RISE in a predominantly lime green can. Beginning no later than early 1969, Carter has packaged the menthol flavor of RISE in a predominantly blue can.

In April, 1970, Johnson first introduced Edge on the national market. Johnson adopted a trademark and logo for Edge consisting of four white, lower-case letters. Johnson packaged Edge in a predominantly green can. The predominant color of the Edge can was similar to the shade of green which RISE used prior to the introduction of Edge. Carter had adopted the use of a black background for the white "rise" logo over a full year prior to Johnson's adoption of a black background for its white logo.

Johnson introduced Edge menthol in the national market in June, 1971. Johnson adopted a predominantly blue background for the Edge menthol can. This was some two years after Carter adopted such a blue background for the RISE menthol can.

Johnson introduced Edge lime on the national market in February, 1972. Johnson adopted a lime green background for the Edge lime green can. This was some three years after Carter had adopted such a lime green background for the RISE lime can.

Over the years, Carter has introduced line extensions of RISE. In 1979, initial package graphics were prepared for RISE Gold, a proposed line extension for RISE. An independent package designer was called in to prepare comprehensives of proposed packaging for RISE Gold. In January or February of 1980, Carter proceeded to market RISE Gold in a package based on the independent designer's work.

In 1979, Carter's RISE product management began the necessary work on possible packaging for RISE Super Gel. In late 1979 or early 1980, RISE brand management decided to proceed with the development of packaging for RISE Super Gel. The outside designer who had worked on RISE Gold was again contacted. The directions to him were to develop packaging for RISE Super Gel based on the packaging for RISE Gold, which had earlier been favorably received by Carter. He supplied RISE Super Gel comprehensives to Carter. These comprehensives generally followed the prior design for RISE Gold. One or more of these comprehensives were used as the basis for the RISE Super Gel can.

The person who had the responsibility for setting color standards for Carter products selected a shade of blue for RISE Super Gel Regular. This color was chosen because it was aesthetically pleasing, apparently attractive to customers, and readily available. For RISE Super Gel Lime, it was determined that Carter would continue to use the same shade of lime green which had been used on all RISE Lime products since the late 1960's.

In a packaging sense RISE Super Gel constituted an extension of defendant's RISE product line as illustrated by the package graphics' prominent display of the distinct product logo, "rise." Production of the actual RISE Super Gel cans began in late 1980. RISE Super Gel regular and lime went on the market nationwide in Jan-

uary, 1981, and have been on the market continuously since then.

Shortly after Carter introduced RISE Super Gel, with its yellow "Super Gel" logo, Johnson placed a prominent yellow "Ultra Gel" burst on Edge.

Since RISE Super Gel's introduction, Edge sales have continued to increase. Johnson must prove four essential elements to establish its Unfair Competition claim. They are: (i) nonfunctionality, (ii) priority of use, (iii) secondary meaning and (iv) likelihood of confusion.

### Functionality

 The evidence establishes that the following features of both the RISE and Edge packages are functional: (1) the seven-ounce Sepro can manufactured by the Continental Can Company; (2) the predominant color of lime green used to package both lime-flavored RISE and lime-flavored Edge; and (3) the predominant color of blue used to package both menthol RISE and menthol Edge.

The seven-ounce Continental Can Company Sepro can used to package both RISE and Edge is the only can on the market which can properly dispense a gel shaving cream; it is, therefore, obviously functional. This accounts for much of any similarity in the physical appearance of the parties' cans.

Use of lime green and blue to designate lime and menthol "flavors" constitutes a functional convention within the shave cream industry neither unique nor original to plaintiff.

### Priority

 The evidence establishes that Carter had priority of use over Johnson for the following shaving-cream-can trade dress features: (1) a white four-letter lower-case logo ("rise"); (2) predominant package colors of blue, bluish green, and lime green; and (3) the use of a white logo on a black background. The introduction into commerce of the four-letter, lower-case "rise" logo preceded that of the "edge" logo by

approximately 20 years, "rise" having been introduced in 1949, "edge" in 1969, 1970. The Johnson personnel responsible for developing and approving the Edge package design were aware of the pre-existing white, lower-case "rise" logo. Defendant's use of blue and lime green on RISE shaving cream products goes at least as far back as early 1969, preceding plaintiff's use of these colors for the trade dress of Edge. Defendant's use of the predominant package color blue-green dates at least as far back as 1957 with the introduction of the original RISE Menthol.

Finally on priority, defendant's use of the "rise" white, four-letter, lower-case product logo on a black "rise hot" can preceded plaintiff's use of a similar motif for Edge.

### Secondary Meaning

 Assuming that aspects of the Edge can have taken on secondary meaning, Johnson has not proven that any distinct, nonfunctional feature of the Edge can: (a) is common to the RISE can, and (b) took on secondary meaning prior to its adoption or first use by Carter on RISE.

### Likelihood of Confusion

 For the following reasons, the Court finds that there is no likelihood of confusion between RISE Super Gel and Edge resulting from the simulation of protectible features of the Edge product.

As a threshold issue, this Court as trier of fact has several times visually compared the RISE Super Gel cans with the Edge cans. The Court finds that there is no substantial similarity between the overall appearance of the RISE Super Gel and Edge cans attributable to protectible trade dress features, i.e., nonfunctional features as to which Johnson can claim priority of use. There are substantial dissimilarities between the graphic design and colors of plaintiff's and defendant's respective cans which obviate any likelihood of confusion.

Most important to keep in mind is that RISE Super Gel prominently and centrally displays the 35-year old "rise" trademark

and logo and Edge prominently shows the "edge" trademark and logo.

RISE Super Gel uses a prominent parallelogram or "cartouche" to frame the words "rise Super Gel." Edge has no cartouche. The central graphic feature of Edge is and has been a unique stylized "foaming up" curved funnel or spout design emanating from the "d" in "edge," representative of gel turning to foam; RISE Super Gel has no such design.

There are several other differences between the trade dress features which also support the Court's finding of substantial dissimilarity relating to the caps of the respective cans, the copy on the rear of the packages, the case of the print and the colors of some of the cans, among other things.

### Intent to Pass Off

The Court finds no credible evidence of intent on the part of defendant to simulate the trade dress of plaintiff's Edge or to "pass off" defendant's product, RISE Super Gel, as that of plaintiff. To the extent that there are features common to RISE Super Gel and Edge, they are explained by the fact that they are (a) functional features or (b) nonfunctional features as to which Carter had priority. Indeed, it could be argued that if either party copied the other, it was Johnson who copied RISE, not the converse as is claimed here.

Although defendant was obviously aware of the existence and appearance of plaintiff's product, there is no evidence that defendant instructed either its own art director or any outside designer to pattern the Super Gel can design after Edge.

### Evidence of Actual Confusion

Johnson has pointed to five incidents which it claims establish actual confusion as to the products. Johnson has not proven that any of the five [4] people involved ever saw the RISE Super Gel trade dress before the purchase in question. Four of the five witnesses, who often wore corrective lenses, either were not wearing eyeglasses or could not recall whether they had them on at the times in question. The fifth witness who did not wear glasses testified that he had not looked at the can when he bought it. Taking the deposition testimony of these five witnesses at face value, and in the best possible light for plaintiff, it does not demonstrate a substantial level of confusion in the market as a whole. In the period covered by these five instances, tens of millions of cans of Edge were bought and sold without any evidence of confusion. No witness within the subpoena range of this Court, the most populated area in our land, appeared to claim that he had been confused concerning a single can of Edge or RISE over the past four years. Johnson's evidence of confusion is de minimis at best.

### No Survey Evidence

This Court finds that Johnson has failed to introduce any survey evidence tending to prove a likelihood of confusion between RISE Super Gel and Edge. Plaintiff neither commissioned nor offered into evidence any consumer survey designed to measure any likelihood of confusion between plaintiff's and defendant's shaving gel product as a result of these products' respective trade dress, although such a survey could have been so conducted.

Instead of conducting a proper confusion survey, Johnson has attempted to substitute results of studies conducted by Carter for entirely different purposes—the so-called "package probe" and the ASI entity tests.

### The Package Probe

Defendant's "package probe" study did not reflect, nor was it designed to reflect, any likelihood of confusion between Edge and RISE based upon these products' trade dress. The "package probe" study was

---

**4.** It should be noted that two of the five "confusion" witnesses, Messrs. Tatosian and Tokat were personally friendly with Noubar Tchourskjian, a Johnson employee who worked on Edge. In a sense they were recruited by him as witnesses.

formulated to determine consumer perception as to the similarity between plaintiff's and defendant's shaving gel products, not as to any similarity between these products' packages. Internal Carter documents make clear that the study was conducted for the sole purpose of making sure that most consumers knew what a "gel" shaving product was. The minutes of the November 13, 1960 RISE meeting (of Carter's management) state

> Mr. Hoyt raised a concern with regard to Rise Super Gel. He questioned whether or not men were familiar enough with the gel concept. Research will be done to determine if the shaving gel concept has been established among the majority of men and whether the new Rise Super Gel package communicates to men.

The resulting survey specifically asked consumers' opinions about the nature of "the product in [the] can" and the "product formulations" of RISE Super Gel and the leading gel and foam, not about source or origin. It also asked consumers whether they knew that, generically, Edge was a gel. The study confirmed that 100% of Edge users realized that "the product in this new RISE SUPER GEL can" was a gel like Edge, and not a foam like Gillette Foamy, and that virtually all these Edge users (92%) expressly stated that they reached this correct result because both products were gels.

The evidence further reveals that defendant's product was already manufactured, warehoused, and, about to be marketed in its previously chosen packaging irrespective of the results of the "package probe."

### The ASI Entity Tests

This Court finds that the ASI Entity Tests conducted by Carter on certain RISE Super Gel commercials do not in any way tend to prove a likelihood of confusion between the Edge cans and the RISE Super Gel cans. These tests came into evidence based upon testimony of an employee of

ASI, a well-known independent market research company. He was familiar with the use and interpretation of ASI's Entity Tests. This man, Anton Schneider, gave testimony about the ASI Entity Tests, which were conducted with respect to four of defendant's television commercials; "An Era Begins," "Presenter Animation," "Presenter-Shaver" and "Under Your Skin." They showed poor product recall,[5] but they did not attempt to measure nor did they actually reflect any confusion as to source or origin attributable to defendant's trade dress.

Professor Yoram Wind testified for Johnson in support of plaintiff's contention that defendant sought to design a package confusingly similar to that of Edge. The Court does not credit that testimony. The professor, among other things, did not know what a Sepro can was and he was not aware of the use of the RISE trademark and logo in lower case lettering since the 1950's.

▮ Plaintiff has not suffered actual or imminent harm because of defendant's trade dress. Defendant's sales of RISE Super Gel have been minimal while Edge products have gone from 17.3 million in fiscal '79/80 to 34.3 million in fiscal '82/83.

### Alleged False Advertising

Johnson's claims of "false advertising" are based on a written statement that "AMONG USERS WHO DID NOT IDENTIFY EITHER PRODUCT, RISE SUPER GEL WAS PREFERRED NEARLY 2 TO 1 OVER EDGE." This statement was contained in sales literature which was not shown or distributed to the general public. It was apparently shown or distributed to an undetermined, but small, number of persons in the toiletries trade in late 1980 or early 1981. Although in late 1980 or early 1981 Carter contemplated producing one or more television commercials using this

---

**5.** The four RISE commercials in question were unquestionably weak in carrying the RISE message to the consuming public, but the Court does not find this probative of any intent on Carter's part to trade off Edge.

text, no such commercial was ever made or broadcast.

■ Johnson bears the burden of proving three essential elements under its claim of "false advertising": (1) that Carter made a claim concerning RISE Super Gel, (2) that that claim was in fact false, and (3) that Johnson has been injured, so as to be entitled to damages, or is likely to be injured in the future, so as to be entitled to injunctive relief.

■ Johnson introduced no evidence as to consumer or audience reaction to the challenged advertising materials. In the absence of any demonstrated audience reaction this Court finds that Johnson has failed to prove that these materials convey any subliminal or implicit message. *American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 165–66 (2d Cir. 1978); *American Brands, Inc. v. R.J. Reynolds Tobacco Co.*, 413 F.Supp. 1352, 1356–57 (S.D.N.Y.1976); *McNeilab, Inc. v. American Home Products Corp.*, 501 F.Supp. 517, 524–25 (S.D.N.Y.1980).

■ To prevail, Johnson must prove that the statement was actually and literally false on its face, and not simply deceptive, misleading, or subliminally false.

On this record, it appears that Carter's challenged claim is true. In 1980, shortly before RISE Super Gel was placed on the market, Carter had Field and Facts, Incorporated, an independent testing company, conduct a comparative consumer product test between Edge and RISE Super Gel. In a blind test, i.e., among those respondents who could not recognize either product, RISE Super Gel was preferred to Edge by a factor of nearly two to one. Carter three times had three successive formulations of its proposed shaving gel blind-tested nationally against Edge, among Edge users by Field and Facts.

In the third and final test, fielded in April, 1980, RISE Super Gel was favored over Edge by 54% to 29%, a factor of nearly two to one, among those who did not recognize either product. As the final report noted,

... there was recognition that Edge users may identify their own brand despite the blind labeling, it was intended to measure in Test III the extent of this occurrence. This was deemed necessary because Edge is such a formidable brand.... Such questioning was desirable in order to extract and analyze that group of consumers who really participated in the test in a true blind situation (i.e., without recognizing Edge) to obtain their reactions to both products.

Half of those tested did recognize Edge, but the report went on to state "when consumers did not recognize Edge, RISE Gel was preferred by a 2:1 ratio. These consumers were truly engaged in a 'blind test'."

On this record, the claim challenged by Johnson is true.

Although Johnson did conduct its own comparative study of RISE Super Gel and Edge the Johnson study did not address the issue of whether or not RISE Super Gel was favored over Edge among consumers who did not recognize either product. Thus, the Johnson study was not relevant to the claim by Carter which is being challenged.

Further, the Court finds that plaintiff has failed to prove that it has suffered any actual or imminent harm as a result of Carter's once-contemplated comparative advertising claim.

## CONCLUSIONS OF LAW

Because this Court has subject matter jurisdiction in part because of the patent provisions of 28 U.S.C. § 1338(a), any appeal in this action would be taken to the Court of Appeals for the Federal Circuit, successor to the former Court of Customs and Patent Appeals, 28 U.S.C. § 1295(a)(1), rather than to the Court of Appeals for the Second Circuit. The Court of Appeals for the Federal Circuit has not yet decided whether in such a case the law of the Federal Circuit or that of the Second Circuit should apply. *Litton Systems, Inc. v.*

*Whirlpool Corp.*, 728 F.2d 1423, 1445 (Fed. Cir.1984).

In any event, Johnson's Unfair Competition and False Advertising claims fail under the precedents in either or both Circuits.

### Unfair Competition and Trade Dress Infringement

██ Plaintiff, bears the burden of proving the following four essential elements under its claims of unfair competition and trade dress infringement under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a):

(1) That defendant's trade dress is so substantially similar to plaintiff's that there is a "likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Spring Mills, Inc. v. Ultracashmere House, Ltd.*, 689 F.2d 1127, 1129 (2d Cir.1982) (quoting *Mushroom Makers, Inc., v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116 [99 S.Ct. 1022, 59 L.Ed.2d 75] (1979) );

(2) That the complained of similarity in the appearance of the parties' trade dress is attributable to primarily nonfunctional features. *Litton Systems, Inc.*, 728 F.2d at 1444–45; *Vibrant Sales, Inc. v. New Body Boutique, Inc.*, 652 F.2d 299, 304–05 (2d Cir.1981), *cert. denied*, 455 U.S. 909 [102 S.Ct. 1257, 71 L.Ed.2d 448] (1982); *Perfect Fit Industries, Inc. v. Acme Quilting Co. Inc.*, 618 F.2d 950, 955 (2d Cir.1980), *cert. denied*, 459 U.S. 832 [103 S.Ct. 73, 74 L.Ed.2d 71] (1982);

(3) That plaintiff's trade dress has acquired a "secondary meaning" as a mark whose primary significance is identifying plaintiff's product with a particular source. *Litton Systems, Inc.*, 728 F.2d at 1444–45; *Warner Bros. Inc., v. Gay Toys, Inc.*, 724 F.2d 327, 332 (2d Cir. 1983); *Vibrant Sales*, 652 F.2d at 303–04, *cert. denied*, 455 U.S. 909 [102 S.Ct. 1257, 71 L.Ed.2d 448] (1982); and

(4) That plaintiff's trade dress acquired secondary meaning prior to defendant's use of allegedly similar dress. *Columbia Mill Co. v. Alcorn*, 150 U.S. 460, 463–64 [14 S.Ct. 151, 151–52, 37 L.Ed. 1144] (1893); *Saratoga Vicny Spring Co. v. Lehman*, 625 F.2d 1037, 1043 (2d Cir.1980); *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F.Supp. 602, 608 (S.D.N.Y.1979); *see also Litton Systems, Inc.*, 728 F.2d at 1446.

There is an apparent discrepancy between the standards of review most recently adopted by the Second and Federal Circuits and it is as yet unsettled as to whether the ultimate issue of likelihood of confusion is more properly decided by this Court as a question of fact or of law. *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1569 (Fed.Cir.1983) (law); *Warner Bros. Inc. v. American Broadcasting Cos.*, 720 F.2d 231, 246 (2d Cir. 1983) (fact); *Litton Systems, Inc.*, 728 F.2d at 1445 (declining to decide which standard of review is controlling where inter-circuit conflict exists); *see also Eloy's Big Boys v. Frisch's Restaurants, Inc.*, 459 U.S. 916, 103 S.Ct. 231, 74 L.Ed.2d 182 (1982) (White, J., dissenting from the denial of certiorari, noting split in authority).

In the instant case, the Court rules both as a finding of ultimate fact and as a conclusion of law that there is no likelihood that an appreciable number of ordinarily prudent consumers are confused as to the source or origin of defendant's RISE Super Gel based upon the finding that Johnson failed to meet its burden of proving any of the above elemental requisites of trade dress infringement.

The remaining issues—non-functionality, priority of use and secondary meaning—present questions of fact for this Court as trier of fact.

While the Court finds that plaintiff has failed to satisfy any element of its trade dress infringement-unfair competition claim, each of the above four requisites—substantial similarity, nonfunctionality, secondary meaning, and prior use—constitutes an alternative, independent requirement to

be met by plaintiff to establish its § 43(a) claim. Hence, the failure to satisfy any of these four elements would mandate that Count II of the complaint be dismissed. *Cf. Litton Systems, Inc.*, 728 F.2d at 1444–45.

■ In the instant case, the plaintiff has failed to demonstrate that the shape, size and color of the parties' respective cans are primarily non-functional, *see supra* at 1312, and plaintiff has similarly failed to show that the alleged likelihood of confusion is caused by other than functional features. Accordingly, the Court concludes that no actionable trade dress infringement has taken place. *Perfect Fit Industries, Inc.*, 618 F.2d at 955, *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982); *Remco Industries, Inc. v. Toyomenka, Inc.*, 286 F.Supp. 948, 952 (S.D.N.Y.1968), *aff'd per curiam*, 397 F.2d 977 (2d Cir. 1968).

■ Further, the record reveals that prior use of such prominent, shared trade dress features as the white, lower-case, four-letter logo, the corresponding dark color or black background, and the predominant background colors lime green and blue resides not with the plaintiff, but with the *defendant. See supra* at 1310–1311. Plaintiff, having failed to establish prior use of these or other design elements employed by defendant, cannot be heard to complain of any trade dress infringement. *Columbia Mill Co.*, 150 U.S. at 463–64, 14 S.Ct. at 151–52.

As to secondary meaning the Court does not believe that plaintiff has proven that the Edge trade dress has acquired a second meaning to the consumer as a mark whose primary significance is identifying the product with a particular source. *Warner Bros. Inc. v. Gay Toys, Inc.*, 724 F.2d at 332; *see Vibrant Sales, Inc.*, 652 F.2d at 303–04, *cert. denied*, 455 U.S. 909, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982).

■ Plaintiff has failed to meet its burden of proving that the primary significance of Edge's trade dress is its identification of that product's source. The Court finds that the primary significance of the size, shape and color scheme of the various Edge flavors is their utilitarian and aesthetic appeal. These features are dictated by mechanical function, industry convention, and consumer taste, and are functional rather than referential in nature. The feature of Edge's graphic design which is most distinctive—the funnel emanating from the "d" of plaintiff's product logo—is conspicuously absent from defendant's can.

Plaintiff has failed to show the infringement of any elements of its trade dress which have acquired the requisite secondary meaning. *See Warner Bros. Inc. v. Gay Toys, Inc.*, 724 F.2d at 333–34; *Mattel, Inc. v. Azrak-Hamway Int'l, Inc.*, 724 F.2d 357, 360–61 (2d Cir.1983).

While plaintiff must demonstrate all of the forementioned elements—non-functionality, secondary meaning, and priority of use—proof of substantial likelihood of confusion based on protectible product features remains the sine qua non of a trade dress infringement action under § 43(a) of the Lanham Act. *Spring Mills, Inc.*, 689 F.2d at 1129; *Berlitz Schools of Languages of America, Inc. v. Everest House*, 619 F.2d 211, 215 (2d Cir.1980).

■ To satisfy the "likelihood of confusion" standard governing trade dress infringement, plaintiff must establish:

(1) That the confusion averred is as to the source of the product, not merely its appearance or nature. *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 663 (2d Cir.1979), *cert. denied*, 445 U.S. 951 [100 S.Ct. 1601, 63 L.Ed.2d 787] (1980); *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1059 (2d Cir.1979); *Bi-Rite Enterprises v. Button Master*, 555 F.Supp. 1188, 1195 (S.D.N.Y.1983);

(2) That consumer confusion as to source is not merely possible, but likely. *Mushroom Makers, Inc.*, 580 F.2d at 47, *cert. denied*, 439 U.S. 1116 [99 S.Ct. 1022, 59 L.Ed.2d 75] (1979);

(3) That this likelihood of confusion has reference to the "average" or "ordinary

prudent" consumer and not to the "way-faring fool." *RJR Foods, Inc.*, 603 F.2d at 1060; *Feathercombs, Inc. v. Solo Products Corp.*, 306 F.2d 251, 257 (2d Cir.1962), *cert. denied*, 371 U.S. 910 [83 S.Ct. 253, 9 L.Ed.2d 170] (1962); *Le Sportsac, Inc.*, 478 F.Supp. at 609; and (4) That an "appreciable number" of such "ordinary" consumers are likely to be misled or confused. *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1138 (2d Cir.1979); *Mennen Co. v. Gillette Co.*, 565 F.Supp. 648, 653 (S.D.N.Y. 1983), *aff'd*, 742 F.2d 1437 (2d Cir.1984).

Though no one factor is generally considered dispositive *Lever Bros. Co. v. American Bakeries Co.*, 693 F.2d 251, 253 (2d Cir.1982), courts have consistently reserved the right to decide whether a visual comparison of the subject products reveals such lack of substantial similarity as would preclude any likelihood of confusion. *Warner Bros. v. American Broadcasting Cos.*, 720 F.2d at 246; *B & L Sales Associates v. H. Daroff & Sons, Inc.*, 421 F.2d 352, 354 (2d Cir.1970), *cert. denied*, 398 U.S. 952, 90 S.Ct. 1873, 26 L.Ed.2d 292 (1970); *Durham Industries, Inc. v. Tomy Corp.*, 630 F.2d 905, 918, 919 (2d Cir.1980); *Vitarroz Corp. v. River Brand Rice Mills, Inc.*, 266 F.Supp. 981, 981–84 (S.D.N.Y.1967); *Carousel Group, Inc., v. Tamasha Enterprises Ltd.*, No. 82 Civ. 2331, slip op. (S.D.N.Y. May 6, 1983).

■■■■ Key to the Court's determination as to likelihood of confusion, whether this is decided as a matter of fact or law, is whether the defendant manufacturer's or product brand name has been clearly displayed. The prevailing wisdom is that:

[t]he most common and effective means of apprising intending purchasers of the source of goods is a prominent disclosure on the container, package, wrapper, or label of the manufacturer's or trader's name * * * [and that when] that is done,

there is no basis for a charge of unfair competition.

*Venn v. Goedert*, 319 F.2d 812, 816 (8th Cir.1963), cited in *Litton Systems*, 728 F.2d at 1446, and

... why affixing a name is not sufficient to avoid a likelihood of confusion should oe shown by the plaintiff, and not assumed by the trial judge.

*Litton Systems, Inc.*, 728 F.2d at 1447 (citation omitted); *accord Bose Corp. v. Linear Design Labs, Inc.*, 467 F.2d 304, 310 (2d Cir.1972); *American Rolex Watch Corp. v. Ricoh Time Corp.*, 491 F.2d 877, 879 (2d Cir.1974); *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 378–79 (1st Cir.1980); *Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F.Supp. at 609. Hence, having found the "rise SUPER GEL" logo clearly and prominently displayed on defendant's product, *see supra* at 1312, the Court concludes that there is no likelihood of consumer confusion.

Even were this Court to find defendant's trade dress similar to plaintiff's, which it does not, the Court does not believe that Johnson has established an intent to imitate on Carter's part, or sufficient credible instances of actual consumer confusion. Moreover, there is no credible survey evidence of any actual or likely confusion.

All of the above leads to the conclusion that plaintiff has failed to meet its burden of establishing a likelihood of consumer confusion as to the source or origin of defendant's RISE Super Gel.[6] *Warner Bros., Inc. v. American Broadcasting Cos.*, 530 F.Supp. 1187, 1198 (S.D.N.Y. 1982), *aff'd*, 720 F.2d 231 (2d Cir.1983) (re: absence of imitative intent); *Mennen Co. v. Gillette Co.*, 565 F.Supp. at 654; *McGregor-Doniger Inc.*, 599 F.2d at 1136 (re: absence of actual confusion); *Affiliated Hospital Products, Inc. v. Merdel Game Mfg. Co.*, 513 F.2d 1183, 1188 (2d Cir.1975) (same); *Mattel, Inc.*, 724 F.2d at 361 (re: absence of survey evidence).

---

6. In early January, 1985, after both sides had rested, counsel for Carter informed the Court that Johnson had introduced a new trade dress for Edge. In view of the Court's decision on the Unfair Competition-Trade Dress aspect of the case there is no need, in any way, for the Court to consider the new trade dress.

Plaintiff did not press its state unfair competition, Uniform Deceptive Trade Practices Act and trademark anti-dilution claims during the course of this litigation. It appears to have abandoned these claims. However, whether abandoned or not, these claims suffer from the same failure of proof which the Court has found fatal to the § 43(a), Lanham Act claim. Lacking the requisite showing of likelihood of confusion, intent to pass off, and of an improperly simulated mark, plaintiff's pendant claims must likewise fall. *Litton Systems, Inc. v. Whirlpool Corp.*, 728 F.2d at 1447–48; *Warner Bros. Inc. v. American Broadcasting Cos.*, 720 F.2d at 247; *Norwich Pharmacal Co. v. Sterling Drug, Inc.*, 271 F.2d 569, 571 (2d Cir.1959), *cert. denied*, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960); *B.D. Communications, Inc. v. Dial Media, Inc.*, 429 F.Supp. 1011, 1014 n. 4 (S.D.N.Y.1977); *Bi-Rite Enterprises, Inc. v. Button Master*, 555 F.Supp. at 1192–93; *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 542, 544, 399 N.Y.S.2d 628, 630, 632, 369 N.E.2d 1162, 1164 (1977).

Plaintiff's failure to meet its burden on the Unfair Competition issues mandates a dismissal of Count II of the complaint in its entirety. Plaintiff is neither entitled to damages nor an accounting on this claim.

### Count III: Alleged False Advertising

Under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), Johnson bears the burden of proving three elements: (1) that Carter is making or has made a claim about RISE Super Gel. *Ringling Bros.—Barnum & Bailey Combined Shows, Inc. v. Chandris America Lines, Inc.*, 321 F.Supp. 707, 713 (S.D.N.Y.1971); *Wolf v. Louis Marx & Co.*, 203 U.S.P.Q. 856 (S.D.N.Y.1978); (2) that this claim is actually false *American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d Cir.1978) (citing with approval *American Brands, Inc. v. R.J. Reynolds Tobacco Co.*, 413 F.Supp. 1352, 1356–57 (S.D.N.Y.1976)); and (3) that Johnson either has been injured or is likely to be injured thereby. *Johnson & Johnson v.* *Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir.1980); *Carey v. Klutznick*, 637 F.2d 834, 837 (2d Cir.1980); *Hershey Creamery Co. v. Hershey Chocolate Corp.*, 269 F.Supp. 45, 56 (S.D.N.Y.1967).

■ There are two types of actionable false advertising: (1) advertising which makes claims which are literally false on their face, and (2) advertising which, although literally true on its face, is perceived by a significant proportion of the relevant market as making "subliminal" or "implicit" claims which are provably false. With regard to the second type of false advertising, the courts sometimes say that the advertising has a tendency to "mislead, confuse, or deceive." *American Home Products*, 577 F.2d at 165–66; *American Brands*, 413 F.Supp. at 1356–57; *McNeilab, Inc. v. American Home Products Corp.*, 501 F.Supp. 517, 524–25 (S.D.N.Y. 1980).

■ To prove the second type of false advertising the plaintiff must come forward with specific scientific survey evidence of consumer reaction. The Court's own perception of whether or not the advertising is misleading is irrelevant and insufficient. Given this governing legal standard, Johnson's claim of false advertising fails both as a matter of fact and as a matter of law.

■ Carter's claim is clearly not false on its face: it summarizes a result of the Field and Facts study. *See supra* at 1315.

Moreover, since Johnson has offered no evidence of audience reaction, there is no basis for finding that Carter's advertising, although not false on its face, makes false implicit or subliminal claims.

As an independent and additional basis for denying relief, the Court notes that Johnson has failed to meet its burden of proving either past injury or prospective likelihood of injury. *See Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d at 189–90; *Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272, 278 (2d Cir.1981); *Carey*, 637 F.2d at 837.

Additionally, the Court holds Johnson's claims of "false advertising" to be moot. It must be emphasized that the advertisements complained of were: (1) never completed in commercial form; (2) prepared at an introductory stage in the product's marketing which has long since passed, and (3) nowhere indicated to be contemplated for imminent use. *See Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 59–60, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975).

Johnson pleaded several pendant state law claims in Count III. These claims appear to have been abandoned at trial. If they have not been abandoned, they require substantially the same proof as § 43(a) of the Lanham Act, and fail for the same reasons.

For the reasons stated above, this Court finds that Count III of the complaint is dismissed in all respects.

### CONCLUSION

For the reasons set forth above, the Court finds for plaintiff on Count I, the Patent claim, and enjoins any further infringement by Carter of the Monson Patent. Further, Carter is enjoined from any further manufacture or sale of RISE Super Gel products. Counsel for the parties are directed to appear before this Court in Courtroom 35 of the United States Courthouse in New York, New York on March 13, 1985 at 2:30 P.M. to arrange to provide the Court with an accounting as to the damages under the Patent claim. Counts II and III relating to alleged Unfair Competition and False Advertising are dismissed.

SO ORDERED.